Bernard OXENBERG, Appellant,

v.

STATE of Alaska, Appellee.

No. 19.

Supreme Court of Alaska.

May 16, 1961.

Rehearing Denied June 29, 1961.

C. L. Cloudy, Ziegler, Ziegler & Cloudy, Ketchikan, Josef Diamond, Lycette, Diamond & Sylvester, Seattle, Wash., for appellant.

Ralph E. Moody, Atty. Gen., of Alaska, Howard P. Staley, Dist. Atty., Ketchikan, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

DIMOND, Associate Justice.

A Ketchikan jury found Oxenberg guilty of the crimes of first degree arson and burning a building with intent to defraud insurers. On this appeal there are various assignments of error—the principal one being the trial court's denial of Oxenberg's motion for a judgment of acquittal. The basis of the motion was that the evidence was insufficient to sustain a conviction because of the lack of competent corroboration of the testimony of an alleged accomplice.

The Independent Salmon Cannery building at Ketchikan was destroyed by fire during the early morning hours of October 3, 1958. Elvin Sahlinger, who had fished for Independent, confessed that he had set the fire with gasoline which he had poured on fishing nets stored in the building. He was convicted of arson on a plea of guilty and received a suspended sentence.

As a witness for the prosecution Sahlinger testified at length regarding the events surrounding the incident. The sum and substance of his narrative was that he had set the fire at Oxenberg's request in consideration for the latter's promise to pay him $2,000. The government produces a quantity of evidence in an effort to corroborate Sahlinger's testimony. It consisted chiefly of the following:

(1) The cannery building was insured.

(2) The fire was of incendiary origin.

(3) The Independent Salmon Cannery was owned by Samuel Oxenberg, appellant's father. The appellant was the only member of the family who took an active part in the management of the corporation. He acted as president after his father's death, signed many papers in that capacity, and executed and submitted to the insurance companies proof of loss with respect to the destruction of the cannery. He had an expectation of sharing in the distribution of his father's estate, the assets of which presumably would have been enhanced by the proceeds from the insurance on the cannery building.

(4) For two years preceding the fire, Independent had operated at a loss. Its annual salmon pack had dropped from 35,000 cases in 1956 to 13,000 in 1958, despite the fact that the total Southeastern pack in 1958 was greater than in 1956. Expectations for fish in 1959 were not good. The fish traps could not operate after 1958, and for various reasons by the fall of 1958 the fishermen upon whom Independent had relied for its supply of fish had dwindled in number to the point where the likelihood of a successful cannery operation was remote. During the 1958 season Independent was short of cash, and a number of substantial bills had not been paid.

The government points to these things as giving rise to a motive for destroying the cannery building—i. e., to close off a business operation where the assets of business had become seriously depleted and where the outlook for the future was bleak.

(5) The cannery accountant discovered the fire at approximately 2:30 a. m. He ran to Oxenberg's room in the cannery building to awaken him, and found him in bed wear-

ing shorts and an undershirt, with the light on in the room. The accountant told Oxenberg to get out as fast as he could (without stating that there was a fire), and Oxenberg sat up in bed and asked if "we were on fire." The fire could not be seen from Oxenberg's room.

The government argues from this that a jury might reasonably have concluded that this indicated Oxenberg's guilty knowledge, and served to corroborate Sahlinger's testimony that Oxenberg had planned the conflagration.

(6) On the date preceding the fire Oxenberg exhibited impatience and irritation with several fishermen who were working on their gear following the close of the fishing season. One fisherman was reprimanded for attempting to hoist a dripping wet seine net in a second story window of the building for storage. The state argues that a jury could infer from this that Oxenberg was concerned about the floor getting any wetter than it already was, for fear it would not burn that night.

The same man, who had been a satisfactory fisherman for Independent for a number of years, was told by Oxenberg to move his nets and gear to another cannery, and if he did not that Oxenberg was going to hurt him. The inference here, according to the State, is that the "hurt" would be the destruction of the fishing gear.

Two fishermen were not permitted to enter the cannery to take showers at about 5 to 5:30 p. m. on the day preceding the fire— Oxenberg stating that the cannery was being locked up. Apparently, this was an unusually early hour to close the building during the period of the year when fishermen were working on their gear. The state asserts that this could create the inference that Oxenberg wanted to get everyone out of the building early so that preparations could be made for the fire.

(7) Independent had been delinquent in payment of its utility bills throughout the summer and fall of 1958, and at the time of the fire owed over $1,900. Demands made for payment from time to time had been unsuccessful. On the day of the fire the utility company informed Oxenberg that if payments were not made immediately a claim would be submitted to the insurance company. Oxenberg promptly paid $1,000 and agreed to pay the remainder within a week. The state contends that a jury could properly interpret Oxenberg's anxiety and actions as showing a consciousness of guilt —that is, his unwillingness to have the insurance companies know of the true financial condition of the cannery.

(8) Miscellaneous groceries, junk and other items that had accumulated in the cannery over a period of years were sold at Oxenberg's direction on the day preceding the fire for over $400. Oxenberg showed concern that the money from the sale be immediately deposited in the bank. The jury could infer from this, the state argues, that Oxenberg was trying to obtain every bit of possible cash out of the cannery before the fire, and did not want the proceeds from the sale of those items to be destroyed.

(9) According to Sahlinger's testimony, a man named Muller was an accomplice of Oxenberg in planning the fire. Evidence was introduced establishing that after the fire Muller gave money to Sahlinger in varying amounts on seven different occasions. The state maintains that this serves to corroborate Sahlinger's statement that Oxenberg had told him, in regard to his compensation for starting the fire, that Muller would take care of him "on the money part."

1. *Corroboration.*

The principal question here is whether there was evidence sufficient to satisfy the statutory requirement of corroboration of an accomplice's testimony.[1] In submitting

---

1. Section 66–13–59, A.C.L.A.1949 provides: "That a conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime, and the corroboration is not sufficient if it merely show the commission of the crime or the circumstances of the commission."

the case to the jury, the trial court instructed them on that point as follows:

" * * * In order for you to determine whether the other evidence in the case corroborates Sahlinger's implication of Oxenberg, you must first put all of Sahlinger's testimony from your mind and then review the evidence that is left in the case to see if it tends to connect the defendant Oxenberg with the crimes charged without reference to the testimony of Sahlinger. If this remaining evidence is as consistent with the innocence of defendant Oxenberg as with guilt, you must acquit him. If it does no more than raise a suspicion, no matter how shrewd or well founded, that defendant Oxenberg might be involved in these crimes, you must acquit him. There must be more than mere conjecture on your part that the defendant Oxenberg is connected to these crimes before you can find that this remaining evidence tends to connect him to them."

Oxenberg has no quarrel with this instruction. He asserts that it evidences a proper construction of the statute—that there is no corroboration unless the evidence offered, considered by itself and not in relation to the accomplice's testimony, is consistent with guilt and inconsistent with innocence.[2] The point he makes, however, is that all of the government's evidence, exclusive of Sahlinger's testimony, was consistent with innocence, and not with guilt; and therefore, there was no evidence sufficient to constitute legal corroboration. Thus, Oxenberg contends that it was error for the court to deny his motion for a judgment of acquittal and to submit the case to the jury.

The requirement of corroboration was based historically on the assumption, or suspicion, that the accomplice might expect to purchase immunity from punishment by falsely accusing and procuring the conviction of others.[3] Implicit here was the assumption that the accomplice was not to be trusted in the story that he told. The word "corroborate" means to strengthen; to make more certain; to confirm.[4] It would seem logical, then, to hold that evidence corroborates when it induces a rational belief that the narrative of the accomplice is a correct one; when it dispels the assumed notion that he was an inventor of facts and incidents. If it does this, then the element of distrust is removed, and the object of the statute is accomplished.

In determining whether there is evidence sufficient to inspire the fact-finders with confidence in the story of the accomplice, it is impracticable to require that what the accomplice has said be put aside and that the other evidence be examined alone to see if it "tends to connect the defendant with the commission of the crime."[5] We are obliged to observe the terms of the Alaska statute. But its language does not provide, as in a Montana statute, that the other evidence be considered by itself and without the aid of the testimony of the accomplice[6]; and we are not compelled to go further, as California has done, and interpret the statute as requiring that the accomplice's testimony be disregarded in applying the test.[7] The other evidence must corroborate, or strengthen or confirm something, and that "something" can only be the testimony of the accomplice. There may be facts, considered without reference to other things, which will have no particular

2. This statement of the rule is supported by decisions from California. See People v. Robbins, 1915, 171 Cal. 466, 154 P. 317, 319; People v. Reingold, 1948, 87 Cal.App.2d 382, 197 P.2d 175, 192.

3. 7 Wigmore, Evidence § 2057 at 322 (3d ed. 1940).

4. Webster, New International Dictionary (unabridged) at 598 (2d ed. 1960).

5. Section 66–13–59, A.C.L.A.1949.

6. See State v. Keckonen, 1938, 107 Mont. 253, 84 P.2d 341, 343.

7. Note 2, supra.

significance, but which, when considered in the light of the accomplice's testimony, assume considerable meaning. It is only logical, then, to hold that corroborative evidence ought to be viewed in relation to, rather than apart from, the accomplice's narrative in order that it might be fairly and rationally appraised for whatever worth it may have. If such evidence can be brought into contact with the circumstances related by the accomplice, and if at all points of contact there is consistency and harmony, rather than incongruity and discord, then there is good ground for presuming that what the accomplice said was true. His credit will have been restored—at least to a point where the jury should be permitted to ascertain for itself whether there has been a confirmation of such a number of important facts related by the accomplice as to give reason for believing that the main body of his story is correct. The corroborative evidence fulfills the requirement that it tend to connect the defendant with the commission of the crime because it will "serve as a means"[8] of inducing in the minds of the jurors a rational belief that the accomplice was speaking the truth when he implicated the defendant in the criminal event.

 It is the court's function to determine whether the evidence was sufficient to meet the statutory requirement of corroboration; it is then the jury's function to decide whether the evidence is effective in making the accomplice's testimony worthy of belief.[9] The trial judge must be allowed considerable latitude in exercising the discretion required of him. He has the opportunity to observe the manner in which the accomplice details the circumstances of the transaction; and the opportunity to form a considered judgment as to whether the accomplice was collected, whether he possessed observation, whether his recollection was fresh, and whether he seemed to be relating actual events or fic-titious and invented ones. The trial judge has the opportunity of comparing the details of the transaction as related by the accomplice with other circumstances in the case. He then has the duty of deciding from this whether such other circumstances fit into or correspond with what the accomplice has said in a sufficient number of particulars to justify the reasonable belief that the accomplice was speaking the truth. If the trial judge is satisfied in this, then he must submit the matter to the jury so that it may decide whether to believe or disbelieve what the accomplice has said.

As noted earlier in this opinion, the government offered a considerable amount of evidence for the purpose of corroborating Sahlinger's testimony. Oxenberg can make a plausible argument that each item considered individually was consistent with innocence—that Oxenberg's actions as related by other witnesses could be viewed as normal behavior in the circumstances in which they occurred. He can also argue with a degree of credibleness that all of the corroborating evidence taken collectively, and considered by itself without relation to Sahlinger's testimony, has no reasonable tendency to connect him with the commission of the crime. But those arguments are not effective when the facts established by other evidence are considered, not alone, but in the light of Sahlinger's testimony. Then those facts have a significance and meaning which they did not have before. They fit in with facts related by Sahlinger to the extent that they improve the quality of his proof and have the logical effect of persuading trust in his testimony. The inferences which the government suggests the jury might have gathered from such corroborative evidence become reasonable ones. At this point there is a rational tendency to associate Oxenberg with the commission of the offense. The statutory requirement of corroboration was then satisfied, and it was

8. One of the definitions of "tend" is "to serve as a means". Webster, New International Dictionary (unabridged) at 2600 (2d ed. 1960).

9. 7 Wigmore, Evidence § 2059(d), at 334 (3d ed.1940), and authorities there cited.

proper for the trial court to allow the jury to weigh all of the evidence, including Sahlinger's testimony, and determine whether what he said was true.

■ The trial judge instructed the jury to first put Sahlinger's testimony aside, and then determine whether the remaining evidence, standing alone, was consistent with innocence or consistent with guilt. If consistent with innocence, then Oxenberg was to be acquitted. We hold that this was not a correct interpretation of the statute. Under our interpretation, the trial court's instruction was more favorable to Oxenberg than was necessary. Hence, he has nothing to complain about.

2. *Validity of the Indictment.*

■ In the indictment the United States of America was named as plaintiff, and prosecution of the case was by the United States attorney. The offense charged was a violation of state law, and prosecution was instituted and concluded after Alaska became a state but prior to the organization of the constitutional state court system. The case was tried by the District Court for the District (Territory) of Alaska. Oxenberg contends that in these circumstances the indictment was invalid because prosecution was not under state authority and was not under the control of qualified state officials.

In the case of Hobbs v. State of Alaska, Alaska 1961, 359 P.2d 956, we held that the United States District Court for the District (Territory) of Alaska was clothed with jurisdiction of state matters after Alaska became a state and prior to the organization of the state court system. We upheld the jurisdiction of that interim transition court as it related to the prosecution of the crime of larceny in a building, a state offense.

The existence of the interim court was originally contemplated by the delegates to Alaska's constitutional convention. The state constitution, which was ratified by Alaska's voters on April 24, 1956, provided in article XV, section 17 that until the state courts were organized, "the judicial system shall remain as constituted" on the date of admission of Alaska as a state. In section 18 of the Statehood Act, Congress specifically provided that the judicial system so remain by stating that the Territorial district court "shall continue to function as heretofore."[10] In addition, the same section provided that the tenure of the United States attorneys would terminate at such time as the interim court would cease to function. Alaska then approved the provisions of the Statehood Act in S.L.A.1959, chapter 50, section 31(2), as amended by S.L.A.1959, chapter 151, section 2.

Under the judicial system which preceded statehood, and as a part of the functioning of the Territorial district court, prosecution of a criminal action was in the name of the United States[11] and was carried on by the United States attorney.[12] This method of handling criminal actions was to continue without change during the period of transition. Therefore, the case against Oxenberg was dealt with just as it ought to have been, and his claim of error on this point has no merit.

■ Oxenberg's next contention is that the indictment was invalid because it did not bear the endorsement of the names of witnesses examined before the Grand Jury. This argument is also without merit. We are in accord with what was said by the United States Court of Appeals for the Ninth Circuit:

"* * * the names of witnesses are not required to be endorsed on any indictment in the District Court for the Territory of Alaska. Such indictments need only conform to the requirements of Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. The indictment in this case did so conform. It should be noted and remembered that

10. Alaska Statehood Act, § 18, 72 Stat. 350 (1958), 48 U.S.C.A. preceding section 21.

11. Section 66–1–4, A.C.L.A.1949.

12. 31 Stat. 324 (1900) 48 U.S.C.A. § 109 (1952).

'the Federal Rules of Criminal Procedure are now, and have been since October 20, 1949, applicable to all criminal proceedings in the District Court for the Territory of Alaska. See Rule 54(a) (1) of said rules, as amended by the Supreme Court's order of December 28, 1948, 335 U.S. 953, 954, effective October 20, 1949. Sections 66–8–52 and 66–11–1, Alaska Compiled Laws Annotated, 1949, cited by appellants, became inoperative on October 20, 1949, and remain inoperative." [13]

### 3. *Newspaper Publicity.*

Through a witness named Tebrich the government offered to prove the substance of a conversation that took place in an automobile containing Oxenberg, Tebrich and two other men during the evening preceding the fire. Out of the presence of the jury, Tebrich said that there was a conversation "about as to who is a heavy sleeper and a light sleeper." He did not recall who started the conversation, and he did not testify as to what any particular person said. This testimony was excluded by the court.

That afternoon the Ketchikan Daily News carried a front page story on the day's events of the trial. In approximately the middle of the newspaper account reference was made to Tebrich's statement about light sleepers. The rest of the story, including the heading, was concerned with other developments at the trial. The following morning Oxenberg's counsel moved for a mistrial on the ground that the newspaper had reported testimony which had been excluded by the court, that the jury was presumed to have read it, and that it was seriously prejudicial to Oxenberg. The court denied the motion. Oxenberg assigns this ruling as error.

There was no showing that any juror had read the news account. Oxenberg argues, however, that it would be beyond credibility to believe that one or more of the jurors, who were allowed to separate at the conclusion of each day in court and return to their homes, had not read the article. That may be a fair assumption. [14] But it would not follow necessarily that the trial court committed reversible error in denying the motion for a mistrial. The fundamental question first to be determined is whether the article was prejudicial—i. e., whether it is likely that the jury's verdict was affected by reason of the statements contained in the newspaper. [15]

That likelihood does not appear in this case. This was not an instance where the jurors were exposed to information of a character which the trial judge had considered so prejudicial it could not be directly offered as evidence. [16] Tebrich didn't know who had started the conversation or who had made the statement regarding light and heavy sleepers. Tebrich's narrative of this event was excluded because, in the words of the trial judge, it wasn't "connected up", that is, the government could not produce other or further evidence of a similar or connecting nature. The trial judge did not indicate in any way that he believed the evidence would be prejudicial.

It is extremely doubtful that there could have been any prejudice to Oxenberg—that the jury's verdict was in any way influenced by what one or more jurors may have seen in the newspaper. If the conversation had not been excluded, it would have amounted to nothing more than additional corroborative evidence of the same general type that was admissible and had been introduced. It could have added little to the final result, for without it there was more than

---

13. Soper v. United States, 9 Cir., 220 F. 2d 158, 159, note 2, certiorari denied 1955, 350 U.S. 828, 76 S.Ct. 58, 100 L. Ed. 739. See also United States v. Egelak, D.C.Alaska 1959, 173 F.Supp. 206.

14. Holt v. United States, 1910, 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021, 1029.

15. O'Brien v. State, Tenn.1959, 326 S.W.

2d 759, 766; Gicinto v. United States, 8 Cir., 212 F.2d 8, 10–11, certiorari denied 1954, 348 U.S. 884, 75 S.Ct. 125, 99 L.Ed. 695. Annotation, 31 A.L.R.2d 417, 422, 425 (1953).

16. Cf. Marshall v. United States, 1959, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L. Ed.2d 1250, 1252.

ample corroboration to justify the court's decision to submit the case to the jury.

The trial judge has a large discretion in ruling on issues of this kind.[17] We find no abuse of that discretion.

### 4. *Expert Testimony.*

The Territorial Fire Marshal qualified as an expert witness on the subject of fires, and testified that he had conducted an investigation of the Independent Salmon Cannery fire. Over Oxenberg's objections, this witness stated that in his opinion the fire was of incendiary origin, and he followed this by testifying in detail as to facts upon which his opinion had been formulated.

Oxenberg contends that the admission in evidence of the expert's opinion was erroneous. He asserts that the origin of a fire is a matter of common experience and understanding, that once the pertinent facts are placed in evidence the jury is capable of deciding whether a fire was of incendiary origin just as well as the expert, and that to permit the expert to give his opinion constitutes an invasion of the province and function of the jury and a substitution of the expert's opinion for that of the jury on the ultimate issue to be decided.

There were presented to the jury all of the pertinent facts and materials for the judgment to be exercised by it, i. e., what caused the fire. If this was a matter of such common experience and understanding that the jury could decide the question without receiving assistance by way of an opinion from some other person, then the opinion evidence should have been excluded because it would be superfluous.[18] But if under the particular circumstances related here the jury could receive appreciable help or assistance from the opinion of the expert witness, then his testimony was admissible.[19] It would not be a ground for objection in the latter instance that the opinion embraced the ultimate issue to be decided, i. e., the cause of the fire. The jury decides this issue—not the expert witness—and all that is done is to permit the jury to receive some assistance where it is needed and from a person who, because of his training, experience and observations, is able to render that assistance.[20]

Questions as to the admissibility of expert testimony should be left to the wise discretion of the trial judge.[21] In the particular circumstances of this case, he felt that the origin of the fire could not have been properly understood or determined without the aid of an opinion from a person of special knowledge and experience. He also felt that the witness was qualified to express an opinion on the matter in issue. The record not only bears out those determinations, but also shows that the witness had a sufficient acquaintance through personal observation and other means of investigation to enable him to express an opinion. There was no error in admitting the opinion of the expert witness.

We have carefully examined the remaining specifications of error raised on this appeal and find that they are without merit. Oxenberg has had a fair trial.

The judgment below is affirmed.

17. Marshall v. United States, supra note 16.

18. 7 Wigmore, Evidence § 1918, at 10 (3d ed. 1940).

19. 7 Wigmore, Evidence § 1923, at 21 (3d ed. 1940).

20. This view is in accord with that expressed by the National Conference of Commissioners on Uniform State Laws in its 1953 draft of "Uniform Rules of Evidence." Rule 56(4) provides that "Testimony in the form of opinions or inferences otherwise admissible under these rules is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

21. Gilbert v. Gulf Oil Corporation, 4 Cir., 1949, 175 F.2d 705, 709. See also Standard Oil Company of California v. Moore, 9 Cir., 1957, 251 F.2d 188, 221.