**Roy Lee DIMMICK, Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. 1098.**

Supreme Court of Alaska.

Aug. 7, 1970.

Rehearing Denied Sept. 14, 1970.

Francis J. Nosek, Anchorage, for appellant.

Harold Tobey, Dist. Atty., G. Kent Edwards, Atty. Gen., Juneau, and Richard R. Felton, Asst. Dist. Atty., Anchorage, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, and CONNOR, JJ.

DIMOND, Justice.

This is an appeal from a conviction of robbery.

At appellant's trial Lee Herman testified that he and appellant committed the robbery. The first question raised is whether Herman's testimony was corroborated by other evidence which tended to connect appellant with the commission of the crime.[1]

The victim, Richard Moyer, testified that he was robbed by two men. They were apparently masked, because he could not see their faces or hair. Moyer testified that he had known appellant because the latter had worked for him. Moyer said that he could identify appellant as one of the robbers from his voice and his stature, because appellant seemed familiar with Moyer's house, and by the fact that appellant's accomplice called appellant "Roy" which was his first name.

Appellant testified in his own defense. He confirmed the fact that he had participated in the robbery, but said that he had done so because Herman told him to and because he wanted to prevent Herman from injuring Moyer.

The statutory requirement of corroboration is based on an assumption that an accomplice might falsely accuse others of a crime in order to purchase for himself immunity from punishment.[2] This assumption is dispelled and the statutory requirement satisfied when the corroborating evidence tends to induce in the minds of the jurors a rational belief that the accomplice was speaking the truth when he implicated the defendant in the criminal event.[3] That is what the corroborating evidence did here. Moyer's account of the details of the robbery, his identification of appellant as one of the robbers, and appellant's own admissions regarding his participation in the robbery certainly had the tendency to induce a reasonable belief that Herman's story was true.

The next question is whether appellant's trial counsel,[4] in allowing appellant to testify on his own behalf and make serious judicial admissions, was derelict in his duty to effectively represent his client's interest. Here a constitutional question is raised—whether appellant was denied the right to have the assistance of counsel for his defense, as guaranteed by the federal and state constitutions.[5] This constitu-

1. AS 12.45.020 provides:
*Conviction on testimony of accomplice and corroboration.* A conviction shall not be had on the testimony of an accomplice unless it is corroborated by other evidence which tends to connect the defendant with the commission of the crime; *and the corroboration is not sufficient* if it merely shows the commission of the crime or the circumstances of the commission.

2. Oxenberg v. State, 362 P.2d 893 (Alaska 1961).

3. *Id.* at 897.

4. Appellant's counsel on this appeal was not his trial counsel.

5. The sixth amendment to the United States Constitution provides in part:
In all criminal prosecutions, the accused shall enjoy the right to * * * have the Assistance of Counsel for his defense.
The Alaska constitution, art. 1, § 11, provides in part:
In all criminal prosecutions, the accused shall have the right to * * * have the assistance of counsel for his defense.

tional right will be considered to have been denied if incompetence of counsel renders ineffective the legal assistance to which a defendant in a criminal case is entitled.[6] A defendant is entitled not just to the assistance of counsel, but to the "effective" assistance of counsel.[7]

After the state had rested its case, defense counsel made his opening statement to the jury. He said that appellant would testify because he believed that there were mitigating circumstances involved in his participation in the robbery. Appellant did testify, admitted that he had participated in the robbery, but contended that his involvement was due to Herman's influence, plus appellant's desire to protect the robbery victim from bodily harm.

Appellant does not contend that his counsel prevailed upon him, against his will or better judgment, to testify on his own behalf and thus waive his right to remain silent. Assuming, however, that his decision to testify was influenced by counsel's advice and recommendation, the question is whether this establishes a denial of the effective assistance of counsel.

It does not. The various constitutional guarantees afforded defendants in criminal prosecutions, together with the rule that the government must prove a defendant's guilt beyond a reasonable doubt, are aimed at protecting the innocent from being convicted and punished for offenses they did not commit. There is no jurisprudential principle, arising from the constitution or other source, which prohibits a guilty man from freely admitting his guilt.

When appellant's turn came to present his case, he might have chosen to remain silent. But the state's case against him was a strong one. His decision to testify as he did might have been based on the hope that he could convince the jury he had no real criminal purpose in getting involved in the robbery, or because he hoped that the judge would be influenced to exercise leniency in sentencing in the event he was found guilty. It is not suggested, nor does the record show that appellant did not know of his right to remain silent and did not voluntarily choose to relinquish that right, and that in this respect his counsel failed to represent his best interests.

Assuming that appellant's decision to testify was made upon the advice of counsel, we cannot say that this decision in any way showed lack of diligence or effectiveness on counsel's part. The right to the effective assistance of counsel requires only that counsel be conscientious and diligent in assisting a defendant in having a genuine trial in a reasonable sense[8]—a trial where the government is put to its burden of proving guilt beyond a reasonable doubt, in accordance with established principles of law and fundamental notions of fair play and substantial justice. That was the kind of trial appellant had. Trial counsel's repersentation of appellant was in accordance with high standards of the legal profession. Appellant was afforded the effective assistance of counsel in the constitutional sense.

The last question is whether Herman's testimony was inadmissible because the police had obtained a statement from him in violation of the standards for custodial police interrogation set out in Miranda v. Arizona.[9]

A police officer testified that he arrested appellant when he was in the company of Herman, that he did not arrest Herman, that he advised both appellant and Herman at the time of "their rights against self-incrimination and the fact that they had an opportunity to have an attorney," that he then transported both appellant and Her-

6. White v. State, 457 P.2d 650, 652–653 (Alaska 1969).

7. Anderson v. State, 438 P.2d 228, 229–230 (Alaska 1968); Mead v. State, 445 P.2d 229, 233 (Alaska 1968).

8. White v. State, 457 P.2d 650, 653 (Alaska 1969).

9. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

man to the police station, that the robbery victim came to the station and was unable to identify Herman, so that there was no probable cause for arresting him, that Herman stated that he wanted to have an attorney, and that Herman then made a written statement or confession apparently without anything more being said or done as to getting him an attorney. In the words of the police officer "the decision was made to go ahead and interview him [Herman] after he had requested an attorney full-well knowing that then this confession could not be used against him but merely for the value of the confession against Mr. Dimmick."

We take it from what the officer said that Herman's statement was obtained under custodial police interrogation without acceding to his request to have counsel present to represent him, and in the absence of a waiver of his right to counsel. In these circumstances, Herman's statement could not have been used as evidence against him.[10] Assuming without deciding, that Herman's testimony at appellant's trial suffered from the same infirmity as his written statement to the police, and could not have been admitted in evidence against Herman,[11] the question here is whether such testimony could be used as evidence against appellant.

The rule in *Miranda* was fashioned to counteract the coercion of custodial interrogation, where one's ability to exercise his privilege to remain silent might be undermined. The focus of *Miranda* was upon the right of an individual not to be compelled to incriminate himself.[12]

The privilege against self-incrimination comes from the constitutional prohibition against compelling any person in a criminal case "to be a witness against himself."[13] The language of the constitution is clear. The privilege pertains solely to the person who makes a statement under impermissible conditions where the statement is to be used to convict him, and not some other person. The right is personal in nature—it pertains only to the person from whom a statement is obtained.[14] It cannot reasonably be construed as requiring the exclusion of evidence against one not making any statement in order to protect the rights of the person from whom a statement was obtained in violation of the *Miranda* rule. The rights of the latter are not involved in a criminal prosecution against the former. The constitutional privilege against self-incrimination is not involved. Herman's testimony at appellant's trial was not inadmissible because of such constitutional right.

If Herman's inculpatory statements were involuntary because of the use of a kind of coercion which would repel civilized and decent men, the use of such statements to convict him would violate due process.[15] Whether the use of coerced statements from Herman to convict appellant would similarly violate due process, may involve considerations different from those involved in the privilege against self-incrimination.[16] Statements which are the prod-

10. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Thessen v. State, 454 P.2d 341, 343–344 (Alaska 1969).

11. *See* People v. Morse, 70 Cal.2d 711, 76 Cal.Rptr. 391, 452 P.2d 607, 629 (1969).

12. Nicholi v. State, 451 P.2d 351, 355–356 (Alaska 1969).

13. The fifth amendment to the United States Constitution provides in part:

> No person * * * shall be compelled in any criminal case to be a witness against himself * * *.

Alaska constitution, art. 1, § 9 provides in part:

> No person shall be compelled in any criminal proceeding to be a witness against himself.

14. People v. Varnum, 66 Cal.2d 808, 59 Cal.Rptr. 108, 427 P.2d 772, 775–776 (1967); People v. Denham, 41 Ill.2d 1, 241 N.E.2d 415, 417–418 (1968).

15. Jackson v. Denno, 378 U.S. 368, 385–386, 84 S.Ct. 1774, 12 L.Ed.2d 908, 921 (1964); Rogers v. Richmond, 365 U.S. 534, 540–541, 81 S.Ct. 735, 5 L.Ed.2d 760, 766–767 (1961).

16. Malinski v. New York, 324 U.S. 401, 430–431, 65 S.Ct. 781, 89 L.Ed. 1029,

uct of coercion may be unreliable and untrustworthy, and thus should be excluded as evidence against one not coerced into making them. But more important, coerced statements are condemned because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will."[17] Those human values may be as much involved and in need of protection when an involuntary statement is used to convict one not coerced into making it as well as when used against the one from whom the statement was obtained.[18]

In this case we need not decide whether under due process such a statement may be excluded on objection of one not coerced into making it.[19] There is nothing in the record to suggest that in obtaining the statements from Herman the police indulged in coercion which is offensive to due process.

Our dissenting colleague, Justice Rabinowitz, suggests that by not applying *Miranda* to this situation, which would require the exclusion of Herman's testimony at appellant's trial, we have invited and encouraged the police to conduct incommunicado interrogations and violate the constitutional rights of persons subject to questioning. We do not deprecate the fifth and sixth amendment rights which form the basis for the rule in *Miranda*. The rights of one subject to custodial interrogation to be warned of his privilege to remain silent, of the fact that any statement made by him may be used against him, and of his right to the presence of counsel have fundamental value and should be respected by law enforcement officers.

But we may not compel such respect by reading into the constitutional privilege against self-incrimination words that plainly are not there, under the guise of exercising our supervisory powers to formulate appropriate standards for the enforcement of criminal law in the courts of this state. We do not condone the custodial interrogation of Herman in violation of the rule of *Miranda,* nor should "those who flout the rules escape unscathed."[20] If Herman has been deprived of rights secured by the constitution by reason of police activity relating to this case, redress may be sought under the federal Civil Rights Act.[21] Furthermore, Alaska's legislature is not without the authority, if it chooses to exercise it, to make certain

1046, n. 17 (1945) (Justice Rutledge dissenting).

17. Jackson v. Denno, 378 U.S. 368, 386, 84 S.Ct. 1774, 1785, 12 L.Ed.2d 908, 921 (1964).

18. *See* Malinski v. New York (Justice Rutledge dissenting), *supra* n. 16, 324 U.S. at 431, 65 S.Ct. 781, 89 L.Ed. at 1046.

19. *See* Turner v. Pennsylvania, 338 U.S. 62, 65–66, 69 S.Ct. 1352, 93 L.Ed. 1810, 1813–1814 (1949).

20. Alderman v. United States, 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176, 187 (1969).

21. 42 U.S.C. § 1983 (R.S. § 1979) provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*See* Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

*See also* 18 U.S.C. § 242 which provides:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

types of police conduct a crime, or even to extend the exclusionary rule of *Miranda* and provide that statements obtained in violation of that rule are inadmissible against anyone for any purpose.[22]

The ultimate issue on this appeal is whether appellant's conviction should be affirmed or reversed. On this point the court is evenly divided: Chief Justice BONEY and I would affirm, and Justices RABINOWITZ and CONNOR would reverse and order a new trial. All members of the court are in agreement that the result of this two-to-two decision is affirmance of the judgment of the superior court.

The judgment is affirmed.

RABINOWITZ, Justice.

I agree with Justice Dimond's and Chief Justice Boney's disposition of the corroboration and adequacy of legal representation issues but find that I am in disagreement with their conclusion that Herman's testimony was admissible.

The record in the case at bar unequivocally shows that while in police custody Herman requested counsel. After a conference between the police and a representative of the district attorney's office it was decided to question Herman, without honoring his request for counsel, in order to obtain a confession from him for use against appellant Dimmick. When this decision was made and the questioning took place, both the district attorney and the police knew that they lacked probable cause to arrest Herman and that any confession obtained would be inadmissible at trial against him.[1] In light of these circumstances, I think that my colleagues' belief that Herman's testimony was admissible reflects an unduly narrow reading of *Miranda,* is contrary to the spirit of our decision in Roberts v. State,[2] and indicates an undue reluctance to exercise this court's supervisory powers to formulate appropriate standards for the enforcement of criminal law in the courts of Alaska.[3]

Justice Dimond states that it is unnecessary to decide whether appellant has standing to object to Herman's testimony on the grounds that such testimony was coerced. This conclusion is reached by reasoning that the record is devoid of any evidence that the police employed "coercive tactics" in the due process sense, in obtaining statements from Herman, or that such statements were involuntarily made. I think it highly significant that the Supreme Court of the United States said in *Miranda* that absent requisite warnings to combat the inherently compelling pressures of police interrogation, all custodial questioning is "inherently coercive."

> Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.[4]

Since the adequate protective devices called for by *Miranda* were intentionally

22. *Cf.* Alderman v. United States, 394 U.S. 165, 175, 89 S.Ct. 961, 22 L.Ed.2d 176, 187–188 (1969).

1. The record reveals that Officer Porter testified as follows:
   The same request was made by Mr. Dimmick and one was not appointed at his—for him at that point, but he was not questioned any further. It was felt by myself and a representative of the District Attorney's office agreed that at this point there was no probable cause and probably no hope for any additional evidence turning up that would warrant or substantiate the arrest of Mr. Herman without a confession. So it was—the decision was made to go ahead and interview him after he had requested an attorney full well knowing that then this could not be used against him but merely for the value of the confession against Mr. Dimmick.

2. 458 P.2d 340, 345 (Alaska 1969).

3. Watson v. State, 413 P.2d 22, 26 (Alaska 1966); Bear v. State, 439 P.2d 432, 439–440 (Alaska 1968) (dissenting opinion) (Rabinowitz, J.).

4. Miranda v. Arizona, 384 U.S. 436, 458, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694, 714 (1966).

dodged by the law enforcement authorities in the course of carrying out their custodial interrogation of Herman, I do not believe that this court may properly adopt a voluntary-involuntary pre-*Miranda* test for determination of the admissibility of Herman's testimony. The difficulty of proving physical or psychological brutality inherent in the custodial police interrogation situation was a highly significant factor in moving the Supreme Court in *Miranda* to abandon the voluntary-involuntary test in such circumstances. The teaching of *Miranda* is that all custodial police interrogation is inherently coercive and that no statements obtained in the absence of adequate protective devices can be characterized as voluntary.

One purpose of the *Miranda* decision was deterrence of unlawful police activity. Condoning the tactics of the police and district attorney's office in the case at bar in effect tells the police that they may ignore requests for counsel and disregard claims of the privilege against self-incrimination by persons subjected to custodial police interrogation.[5]

Rather than emphasizing the personal nature of the privilege against self-incrimination, de-emphasizing the right to counsel, and adopting a voluntary-involuntary test as determinative of the admissibility of Herman's testimony, I believe we should focus upon and evaluate the police conduct in question. This approach comports with our duty, under this court's supervisory powers, to formulate appropriate standards for the enforcement of the criminal law. Adoption of an objective test of propriety of police conduct and supplementary exclusionary rule would vindicate the privilege against self incrimination and the right to counsel guaranteed by both the United States and Alaska Constitutions, would effectuate *Miranda's* goal of deterrence of unlawful or improper police conduct, and would harmonize with the spirit of *Roberts*.[6] Utilization of this approach would also facilitate a proper balance between society's interest in the enforcement of its criminal laws and the rights of any individual in police custody to decent treatment. Citizens placed in the circumstances of custodial interrogation by police are not without the law's protection.[7] In my view, any person who is taken into police custody for purposes of questioning, even at a general investigatory stage, is

5. *See also* Justice Peter's concurring and dissenting opinion in People v. Varnum, 66 Cal.2d 808, 59 Cal.Rptr. 108, 427 P.2d 772, 777–780 (1967).

6. In *Roberts*, after indictment was returned and counsel appointed, the police obtained handwriting exemplars from the accused in the absence of his counsel and despite counsel's refusal to consent to the giving of the exemplars. In reversing, we said in part:

> The district attorney should comply with the ethical standards generally applicable to attorneys. While we do not now hold that the United States and Alaska Constitutions necessarily protect those accused of crime against breaches of professional ethics, this court will not eagerly adopt controversial constitutional interpretations which would encourage unethical behavior.

Roberts v. State, 458 P.2d 340, 345 (Alaska 1969).

7. *Compare* Chief Justice Warren's dissent in Bradford v. Michigan, 394 U.S. 1022, 89 S.Ct. 1638, 23 L.Ed.2d 48, 49 (1969) (citations omitted):

> It is now a commonplace that coerced confessions are inadmissible at criminal trials because they are untrustworthy and the methods used to obtain them offend the principle that our system of criminal justice is accusatorial not inquisitorial. * * * Nor do I think it relevant that the coercion in this case was exerted against the chief state witness rather than the accused. As was said by Mr. Justice Rutledge, dissenting in Malinski v. New York * * *:
>
> "Due process does not permit one to be convicted upon his own coerced confession. It should not allow him to be convicted upon a confession wrung from another by coercion. A conviction supported only by such a confession could be but a variation of trial by ordeal."

entitled to be accorded the entire panoply of *Miranda* rights.[8]

The alternative is encouragement of frequent incommunicado custodial police interrogation, with concomitant violations of the constitutional rights of the persons subjected to questioning. I think that this alternative is gravely dangerous for it violates the rights of a person being subjected to custodial interrogation and represents an open invitation to adopt such procedures as a standard method for the solution of particular crimes or for conducting generalized crime hunts. More particularly in order to obtain convictions of others the police are informed by this approach that they can routinely and intentionally violate persons' constitutional rights by interrogating them without permitting them to refuse to answer questions, terminate interrogation or consult attorneys.[9]

Given the intentional and advised refusal of the police to grant Herman's in-custody request for assistance of counsel, I would hold under this court's supervisory powers that his testimony should have been excluded and would therefore reverse appellant's conviction and grant a new trial.

CONNOR, Justice (concurring in part, dissenting in part).

In my view, a dissent should not be undertaken lightly, and certainly not without searching inquiry into whether it is worthwhile. One may often disagree with many of the legal subtleties and verbal nuances of an opinion without sacrifice of conviction. Silent concurrence is then the rule of prudence. But on matters of vital principle, a dissent can be of value in preserving for the future those contentions and theories which may eventually control. In this sense, "A dissent in a court of last resort is an appeal to the brooding spirit of the law, to the intelligence of a future day, when a later decision may possibly correct the error into which the dissenting judge believes the court to have been betrayed." (Chief Justice Hughes, as quoted by Mr. Justice Douglas in "The Dissent: A Safeguard of Democracy," 32 J.A.Jud.Soc. 104 (1948).)

I

I agree with the court's disposition of this case except for the holding that Herman's testimony was admissible.

The majority opinion relies upon People v. Varnum, 66 Cal.2d 808, 59 Cal.Rptr. 108, 427 P.2d 772 (Cal.1967), and People v. Denham, 41 Ill.2d 1, 241 N.E.2d 415 (Ill.1968), for the proposition that statements obtained in violation of the rule laid down in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), can be excluded from evidence only by the person from whom they were obtained and not by another who is affected by the statement having been elicited. In other words, it is held that the benefits of the *Miranda* rule, which prohibits certain types of custodial interrogation of suspects by the police, cannot be asserted vicariously.

The theory underlying the *Varnum* case is that violations of the *Miranda* rule can be regarded as non-coercive if the statements are elicited under conditions which would have rendered them admissible under the due process standards which applied before the *Miranda* decision. In the absence of physical or psychological coercion of a degree which would render the state-

8. Enker & Elsen, Counsel for the Suspect: Massiah v. United States and Escobedo v. Illinois, 49 Minn.L.Rev. 47, 60–61 (1964); Mishkin, The Supreme Court, 1964 Term, Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56, 101 (1965).

9. In my view neither 18 U.S.C. § 242 nor 42 U.S.C. § 1983 provide a workable alternative. The criminal statute, 18 U.S.C. § 242, does not provide any remedy against police conduct not motivated by the victim's race, color or alien status. The civil statute, 42 U.S.C. § 1983, provides no effective remedy where the victim suffered only nominal damages.

ments unreliable and violative of earlier notions of due process, the majority opinion in *Varnum* says in effect that breaches of the *Miranda* rule are not inherently coercive.

In that People v. Denham, *supra,* merely follows *Varnum,* without any meaningful discussion, nothing further need be said about it. In *Varnum,* the wife of one of defendant's confessed accomplices was held in jail from about midnight until six o'clock the following morning, during which time she was induced through police interrogation, and through encouragement by her husband, to reveal the location of a murder weapon used by the defendant. The weapon was introduced in evidence at defendant's murder trial. In affirming the conviction, the majority in *Varnum* held that the failure to accord the wife of the accomplice her rights under the 5th and 6th Amendments, as expounded in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966), did not bar use of the evidence thereby obtained.

The court in *Varnum* was presented with a distinct problem because in a related area it had abandoned the requirement of personal standing as a prerequisite to the assertion of a constitutional right. In People v. Martin, 45 Cal.2d 755, 290 P.2d 855 (Cal.1955), it had ruled that evidence obtained in violation of the 4th Amendment was inadmissible, regardless of whose rights against unlawful search and seizure had been violated. It stressed that the purpose of the exclusionary rule in 4th Amendment violations was to deter unlawful searches and seizures by rendering inadmissible the evidentiary results of such police activity. To make the admissibility of such evidence turn on the standing of the objector, in the technical sense of showing a proprietary or possessory interest in the goods or premises unlawfully invaded, would permit the police to engage in widespread misconduct and purposeful violation of the constitutional provision.

In *Varnum,* the majority tried to distinguish its holding in *Martin* on the ground that while unreasonable searches and seizures always violate the constitution, there is nothing inherently unlawful in questioning suspects who have not been given proper *Miranda* warnings, "so long as the police refrain from physically and psychologically coercive tactics condemned by due process and do not use against the suspect any evidence obtained." 427 P.2d, at 776. It then held that the rights protected by *Escobedo* and *Miranda* are not violated until the evidence obtained without the required warnings is actually introduced against the person whose rights were breached.

As the trenchant dissent of Justice Peters points out, the majority in *Varnum* converted a doctrine protective of fundamental constitutional rights into a mere rule of evidence. 427 P.2d, at 780. It is obvious that the *Varnum* majority exercised a policy choice not to extend its *Martin* principle beyond the 4th Amendment area. Unfortunately, that choice was based upon grounds which are inarticulate and upon a distinction which is difficult to defend.

In Alaska we have not taken a definite position on the standing necessary to assert 4th Amendment rights. It could be argued that we are also free to make a choice about the standing necessary to vindicate 5th and 6th Amendment rights. The United States Supreme Court has not yet laid down a final rule in these matters for the guidance of the states. But in exercising our choice, it would be far preferable to do so fully conscious of the bases and results of decision than to adopt *sub silentio* the questionable rationale of the *Varnum* case.

## II

In order to understand how the exclusionary rule should function, we must look back into its origins and development. One of the significant earlier applications of the rule is found in Weeks v. United States, 232

U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). That case laid to rest an earlier notion that courts could admit evidence obtained by an unlawful search and seizure because such evidence might have probative value. In reaching this conclusion, the court held that the 4th Amendment binds both executive officials and the court to operate within its limitations.

> "This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws." 232 U.S., at 392, 34 S.Ct., at 344.

The court brushed aside the argument that the person victimized by a violation of 4th Amendment rights should be remitted to a civil action against the errant officials.

> "What remedies the defendant may have against them we need not inquire, as the 4th Amendment is not directed to individual misconduct of such officials. Its limitations reach the Federal government and its agencies." 232 U.S., at 398, 34 S. Ct., at 346.

In Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the court constricted the breadth of the *Weeks* case in a wire tapping situation. The mere tapping of telephone lines in violation of a state law was held not to be a violation of the 4th Amendment which would require suppression of the evidence thereby obtained. The court held that the prohibitions of the 4th Amendment were intended to apply to the search and seizure for material objects, and did not cover evidence secured by the use of the sense of hearing. It also employed property law conceptions in holding that the telephone wires were not within the control of the defendant's house or office, and were thus not within the areas to be protected. What is significant about the *Olmstead* case is the classic dissent of Mr. Justice Brandeis, foreshadowing as it did the later evolution of constitutional doctrine and legal theory. In his view the protection guaranteed by the 4th and 5th Amendments extended vastly beyond material things and encompassed a generalized right to privacy and personal integrity.

> "They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect, that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth." 277 U.S., at 478–479, 48 S.Ct. at 572.

He then went on to state a second basis on which illegally obtained evidence should be barred from use in the courts: by allowing such evidence to be introduced, the courts make the government a party to the very wrong committed by its own officers.

> "The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. The rule is one, not of action, but of inaction." 277 U.S., at 484, 48 S.Ct., at 574–575.
>
> "Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent, teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become

a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." 277 U.S., at 485, 48 S.Ct., at 575.

More recently the authoritative decisions have held that the purpose of the exclusionary rule is to deter official misconduct by the agents of government.

"The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effective available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed. 2d 1669 (1960).

In extending both the 4th Amendment and the exclusionary rule to the states in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the court observed:

"Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit the right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice." 367 U.S., at 660, 81 S.Ct., at 1694.

Concurrently it has been recognized that it is the right to privacy and not merely interests in tangible property which are to be protected by the 4th Amendment. In extending protection to conversations overheard as a result of electronic surveillance of a public telephone booth, the court in Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), said, "For the Fourth Amendment protects people, not places." Property law distinctions have largely been abandoned as determinants of whether a particular search and seizure is valid. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); and Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 295, 87 S.Ct. 1642, 18 L.Ed. 2d 782 (1967). Thus, the views of Mr. Justice Brandeis have become central to Fourth Amendment theory and to the application of the exclusionary rule.

## III

In contrast to the exclusionary rule, the rule on standing to object to unconstitutionally obtained evidence is very blurred in its contours. Like the exclusionary rule, the principles of standing have their origin largely in search and seizure cases. Because it was associated with the common law relating to trespass, the law on standing in the earlier cases permitted only a narrow class of persons to assert the illegality of a search and seizure.[1]

The class was broadened somewhat in Jones v. United States, 362 U.S. 257, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960), in which one who had permissive use of an apartment of a friend was given standing to suppress unlawfully seized evidence. In this case property law concepts were abandoned as exclusive determinants of stand-

1. Gaskins v. United States, 95 U.S.App. D.C. 34, 218 F.2d 47 (1955); In re Nassetta, 125 F.2d 924 (2d Cir. 1942); Kelley v. United States, 61 F.2d 843 (8th Cir. 1932); and Lewis v. United States, 92 F.2d 952 (10th Cir. 1937).

ing, and the court held that "any one legitimately on the premises" searched could prevent use of unlawfully obtained evidence against himself. 362 U.S., at 267, 80 S.Ct. 725. The decision still required standing in the sense that one must show that he is the victim of a search in order to claim suppression. The exclusionary rule was said to be a means of protecting the privacy of search victims. This reflects a theory that the exclusionary rule arises out of an interplay between the 4th and 5th Amendments, and that the evidence should be suppressed because it results in personal incrimination of the victim of the search. Wong Sun v. United States, 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886).[2]

But in other cases the court has seemingly rejected the personal incrimination rationale. In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the court refused to give retroactive effect to Mapp v. Ohio, supra, by stressing that deterrence was the purpose of the exclusionary rule. In Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), dealing with retroactive application of the self-incrimination privilege to the states, the court said that the "single and distinct" purpose of the exclusionary rule was deterrence.

Recently in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the court seems to revert to the *Jones* requirement that one seeking suppression of evidence (in this case acquired through wire tapping) show that he himself was the victim of an invasion of privacy.

On the other hand, the court has relaxed the standing requirement for persons asserting other constitutional claims. In Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), litigants were permitted to vindicate constitutional *jus tertii.* While these cases can be explained on the ground that the holders of these rights might find it difficult to obtain an adjudication of their grievances in court, this would cover the principle expressed in Mapp v. Ohio, supra, that, except for the exclusionary rule, "other remedies have been worthless and futile." 367 U.S., at 652, 81 S.Ct., at 1690.

The upshot of all this is that the standing requirement rests on uncertain premises, is applied inconsistently, and has not been brought within any clear rationale other than outmoded property conceptions. What is worse is that the standing requirement is in direct conflict with the exclusionary rule. The decisions have only exacerbated, not lessened, the disharmony between the competing principles. For this reason numerous commentators have proposed that the standing requirement be clarified, modified, or simply abandoned.[3]

It must be recognized that the deterrent effect of the exclusionary rule is lessened to the extent that a standing requirement is imposed. On the other hand, there is probably a point where application of the exclusionary rule is of such marginally slight value in preventing police misconduct that the diminishing returns are outweighed by a need to require standing.

2. What is often overlooked is that the actual issue in *Jones* was whether the defendant was "a person aggrieved" by an unlawful search under Rule 41(e) of the Federal Rules of Criminal Procedure. Thus it was a case of statutory interpretation rather than constitutional standing.

3. H. Friendly, the Bill of Rights as a Code of Criminal Procedure, 53 Cal.L.Rev. 929 (1965); White & Greenspan, Standing to Object to Search and Seizure, 118 U.Pa.L.Rev. 333 (1970); Comment, Search and Seizure: Admissibility of Illegally Acquired Evidence Against Third Parties, 66 Colum.L.Rev. 400 (1966); Comment, Standing to Object to an Unreasonable Search and Seizure, 34 U.Chi.L.Rev. 342 (1967); Note, 81 Harv.L.Rev. 707 (1968).

If we were to seek such a middle position, it would not be necessary to lay down a final rule in the case before us. We could limit our holding to the facts before us, leaving to the future a further development of principles.

No less a judicial moderate than Judge Friendly has proposed that the exclusionary rule should be applied by differentiating between mere errors of judgment or technical mistakes by police officers and conduct which is intentionally or flagrantly illegal. In the latter case the exclusionary rule would be applied as a restraint against deliberate violation of constitutional rights.

> "The beneficent aim of the exclusionary rule to deter police misconduct can be sufficiently accomplished by a practice, such as that in Scotland, outlawing evidence obtained by flagrant or deliberate violation of rights. It is no sufficient objection that such a rule would require courts to make still another determination; rather, the recognition of a penumbral zone where mistake will not call for the drastic remedy of exclusion would relieve them of exceedingly difficult decisions whether an officer overstepped the sometimes almost imperceptible line between a valid arrest or search and an invalid one. Even if there were an added burden, most judges would prefer to discharge it than have to perform the distasteful duty of allowing a dangerous criminal to go free because of a slight and unintentional miscalculation by the police." H. Friendly, supra note 3, at 953 (footnotes omitted).

In my view the doctrine on standing should be balanced against the deterrent purposes of the exclusionary rule, and against the policies exemplified by the constitutional right in question. By such an approach we would avoid fixing an ironclad demarcation of the line of constitutional protection, leaving to the future the problems of how far these guarantees of fundamental rights must be implemented to preserve a just and free society. By the balancing technique we would fulfill one of the great salutary purposes of the exclusionary rule.

If the police can calculate with specificity those situations in which the fruits of constitutional violations cannot be suppressed, then no prophylaxis exists against oppressive, intentional misconduct directed against persons who are innocent of wrongdoing or who are not the targets of criminal prosecution. If, however, a margin of uncertainty is left, a cynical disregard of constitutional rights will carry with it enough hazards that it will tend to check such misconduct. This is why an "all-or-nothing" approach to the requirement of standing is an undesirable judicial technique to employ in cases of this kind.

## IV

The *Miranda* case established that custodial interrogation by police officers, without proper warnings or an intelligent waiver, is an inherently coercive practice violative of the 5th Amendment of the constitution.

Like the rules on search and seizure, the *Miranda* rule is one which is designed to restrain and deter police officers from violating the privilege against self-incrimination. It is a rule which sets up a legal category of per se coercion whenever it is violated. That the privilege against self-incrimination is a "personal" right makes no material difference. One can also waive his 4th Amendment protections against search and seizure.

What the decisions in Miranda v. Arizona, supra, and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), accomplished was to bring the United States Constitution into the police station and jailhouse. What occurs in those places is part of "a criminal case" in which the accused may not be compelled to incriminate himself. Those precincts are as much within the province of constitutional protection and, perforce, the protection of the courts, as trials which occur in the courtroom.

Many of us might have debated the wisdom of either the *Miranda* or *Escobedo* decisions and the reasoning underlying them. But they are now binding rules of constitutional law to which we must give effect under the supremacy clause. A search and seizure which is constitutionally infirm does not become unlawful when its fruits are offered in evidence, it is unlawful from its inception. Similarly, custodial interrogation in violation of the *Miranda* rule does not become a violation of constitutional right only when the results are offered in evidence at a trial. The interrogation is unlawful at the beginning.

If we were to apply the exclusionary rule to police conduct which is intentionally or flagrantly illegal, reversal unquestionably would be required in the case before us.

Here there was a purposeful violation of the rights of the witness Herman. Concededly no probable cause existed to warrant his arrest. He was being held in custody. He had requested a lawyer. After a consultation between the police and a representative of the district attorney's office, it was decided that his constitutional rights should be abridged, and that the interrogation should continue until the confession was obtained.[4] The purpose of obtaining the confession was that it be used against Dimmick. In other words, Dimmick was at all times the target of the disregard by police and prosecutor of the positive requirements of the *Miranda* rule.[5]

The rule adopted today permits intentional defiance of the constitutional mandate against self-incrimination. The lengths to which it can be carried are illustrated by such recent cases as People v. Portelli, 15 N.Y.2d 235, 257 N.Y.S.2d 931, 205 N.E.2d 857 (N.Y.1965). There the police administered physical beatings to a witness until he inculpated the ultimate defendant. Applying a standing rule like that employed by the majority today, the court sustained the introduction of the testimony of this witness, while impotently deploring the misconduct of the police.

We should close the courtroom door to evidence obtained by intentional violation of fundamental constitutional rights. When we fail to do this we validate the role of government as lawbreaker. This will go a long way toward rendering constitutional principles an "empty promise" and not a guide for actual conduct. This is not a time to be undercutting fundamental guarantees.[6]

For the reasons given, I would reverse the conviction and order a new trial.

4. How a prosecutor, being an officer of the court, could properly advise or encourage the police to violate fundamental constitutional rights is unclear. See Roberts v. State, 458 P.2d 340, 345 (Alaska 1969), where we said:

   "The district attorney should comply with the ethical standards generally applicable to attorneys. While we do not now hold that the United States and Alaska Constitutions necessarily protect those accused of crime against breaches of professional ethics, this court will not eagerly adopt controversial constitutional interpretations which would encourage unethical behavior."

5. The record reveals that Officer Porter testified as follows:

   "The same request was made by Mr. Dimmick and one was not appointed at his—for him at that point but he was not questioned any further. It was felt by myself and a representative of the District Attorney's office agreed that at this point there was no probable cause and probably no hope for any additional evidence turning up that would warrant or substantiate the arrest of Mr. Herman without a confession. So it was—the decision was made to go ahead and interview him after he had requested an attorney full well knowing that then this could not be used against him but merely for the value of the confession against Mr. Dimmick."

6. For some of the broader implications of "adjusting" the 5th Amendment, see A. Goldberg, "Can We Afford Liberty?" 117 U.Pa.L.Rev. 665 (1969).