**Noe Q. FLORES, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 879.**

Supreme Court of Alaska.

July 10, 1968.

**74**

Hugh B. White, Anchorage, for appellant.

Edward W. Burke, Asst. Dist. Atty., Robert K. Yandell, Acting Dist. Atty., Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

RABINOWITZ, Justice.

Jimmy O'Day and George Secco were murdered near Palmer, Alaska, in May of

1966. Appellant, Noe Flores, was thereafter indicted on two counts of murder in the first degree. After trial a superior court jury found appellant guilty of murder in the first degree as to Jimmy O'Day's death and returnd a verdict of manslaughter concerning the death of George Secco. Appellant received a life sentence as to the first degree murder conviction and a concurrent 20-year sentence upon the manslaughter conviction.

Appellant's initial contention in this appeal questions the legal sufficiency of Count II of the indictment. This portion of the indictment charged appellant with the first degree killing of George Secco "by a method and means unknown." The crux of appellant's position is that this language was insufficient to charge the offense of murder in the first degree.[1]

Criminal Rule 7(c) requires that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." This rule further provides that, "It may be alleged in a single count that the means by which the defendant committed the offense are unknown * * *." Appellant seeks to escape the impact of this rule of pleading by arguing that the language of rule 7(c) is in conflict with the substantive provisions of AS 12.40.100 of our Code of Criminal Procedure.

AS 12.40.100(a) (3) provides that indictments shall be direct and certain in regard to "the particular circumstances of the crime charged when they are necessary to constitute a complete crime."[2] We can find no conflict between Criminal Rule 7

---

1. Count II of the indictment reads in full as follows:

That on or about the 30th day of May, 1966, at or near Palmer, in the Third Judicial District, State of Alaska, Noe Q. Flores, being of sound memory and discretion, did willfully, unlawfully, feloniously, purposely and with deliberate and premeditated malice, kill one George Secco by a method and means unknown.

All of which is contrary to and in violation of AS 11.15.010 and against the peace and dignity of the State of Alaska.

2. Subsection (b) of AS 12.40.100 further provides:

The statement of the facts constituting the offense shall be in ordinary and concise language, without repetition, and in a manner which will enable a person of common understanding to know what is intended.

Concerning this portion of AS 12.40.100, appellant advances the argument that employment of the language "by a method and means unknown" falls short of compliance with AS 12.40.100(b).

(c) and the provisions of AS 12.40.100(a) (3), for it has been established that the means and manner by which the victim met his death are not elements of the crime of murder.[3] We hold that Count II of the indictment satisfies the criteria this court has established for determination of sufficiency questions. Count II sets forth the elements of murder in the first degree, apprises appellant of the nature of the offense charged to the extent that he is enabled to prepare his defense, and furnishes a basis for a plea of former jeopardy.[4] Further, review of the entire record has failed to disclose any substantial prejudice to appellant's rights arising from the text of Count II.[5]

Appellant's next grouping of specifications of error is focused upon the testimony of James Gilbert, a witness for the prosecution. At the inception of the witness' testimony, the in-court clerk requested him to raise his right hand and then asked:

> You do solemnly swear that in the cause now on trial before this Court you will tell the truth, the whole truth, and nothing but the truth, so help you God?

Witness Gilbert's response was "I do." On direct examination this witness related that he had perpetrated two burglaries with appellant and that they had hidden the stolen items at an apartment which was occupied by Jimmy O'Day and George Secco. He also disclosed that later, while the proceeds of the burglary were still hidden at this apartment, appellant became aware that the police were looking for O'Day and Secco. More important though, was Gilbert's testimony concerning the various admissions appellant had made to him in regard to his having killed O'Day and

---

3. Cozart v. State, 42 Ala.App. 535, 171 So.2d 77, 81 (1964), cert. denied, 277 Ala. 698, 171 So.2d 84 (1965). In the following cases it was held that the informations and indictments were not defective for failure to specify by what means the homicide was committed: People v. Golston, 58 Cal.2d 535, 25 Cal. Rptr. 83, 375 P.2d 51 (1962), cert. denied, 372 U.S. 955, 83 S.Ct. 954, 9 L.Ed. 2d 979 (1963); State v. Schwensen, 237 Or. 506, 392 P.2d 328 (1964); State v. Belt, 79 S.D. 324, 111 N.W.2d 588 (1961); State v. Dobbs, 70 Wyo. 26, 244 P.2d 280 (1952).

Alaska's first degree murder statute, AS 11.15.010, reads:

> A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice * * * kills another is guilty of murder in the first degree, and shall be sentenced to imprisonment for not less than 20 years to life.

4. Stewart v. State, 438 P.2d 387, 390–391 (Alaska 1968); Price v. State, 437 P.2d 330, 331–332 (Alaska 1968); Theodore v. State, 407 P.2d 182, 190 (Alaska 1965), cert. denied, Theodore v. Alaska, 384 U.S. 951, 86 S.Ct. 1570, 16 L.Ed.2d 547 (1966); Thomas v. State, 391 P.2d 18, 24 (Alaska 1964); Adkins v. State, 389 P.2d 915, 916–917 (Alaska 1964); Marrone v. State, 359 P.2d 969, 979–980 (Alaska 1961).

In the only case relied upon by appellant in support of his argument, State v. Calkins, 63 Idaho 314, 120 P.2d 253, 256 (1941), the court said in part:

> We direct attention to Section 19–1320, I.C.A., providing for the amendment of indictments and informations. If in this or any case the means by and the manner in which the crime was committed are unknown to the prosecutor, then he must so allege in his information.

5. In resolving a sufficiency issue, we said in Thomas v. State, 391 P.2d 18, 24 (Alaska 1964):

> Lastly, the defendant has made no showing that any of his substantial rights were prejudiced by the wording of the indictment in this case.

Prior to trial, appellant moved for a bill of particulars as to Count II regarding the manner and the cause of decedent's death. In response to this motion, the state in part objected "for the reason that the state is unable to set this matter forth with any greater particularity, decay and putrification of the decedent's body having made it impossible for the pathologist to determine the cause of death with any degree of certainty." The trial court then entered an order which read in part: "[T]he State of Alaska is to make available that part of the autopsy report concerning the medical cause of death of George Secco as set forth in Count II of the Indictment."

Secco.[6] At the outset of appellant's cross-examination of this witness, the following transpired:

Q: Mr. Gilbert, yesterday you took an oath before you took the stand. Could you repeat that oath for me please?

A: I swore to tell the whole truth and nothing but the truth.

Q: Are you able to repeat it word for word?

MR. OPLAND: Objection. What's the point?

THE COURT: Well he may ask him if he is, or he may indicate if he isn't.

MR. GILBERT: No. I can't.

MR. KALAMARIDES: Is it because you don't remember it?

MR. GILBERT: I really wasn't paying that much attention to it.

Q: To you then 'so help you God'—do you believe in God?

A: No.

Out of the hearing of the jury, appellant's counsel then moved to strike all the testimony of the witness Gilbert, or alternatively, to declare a mistrial "on the grounds that his testimony would be of no value because the sanctity of the oath has been of no value." The superior court denied appellant's motions. At the conclusion of the state's case-in-chief, appellant moved for a judgment of acquittal as to both murder counts in part on the basis that since no meaningful oath was administered to Gilbert, his testimony had no probative value and, therefore, the testimony of the prosecution's primary witness, George Toloff, was not corroborated.[7] In denying this facet of appellant's motion for judgment of acquittal, the trial judge stated:

Well, I think it's quite clear that a person has to take an oath but, if he takes an oath the presumption is that he understands it and knows what he's doing and the burden is then on the defense to—by cross-examination or otherwise, to show that he does not, and it's strictly a question for the jury, and you may argue the fact that he took the oath and said, 'so help me God,' and then said he was—didn't believe in God as affecting his credibility, but I think it's quite clear that the burden is upon you then to show that he didn't, that the jury may consider your argument. The motion is denied.[8]

Appellant now specifies as error the trial court's denial of all motions he made concerning Gilbert's testimony. Criminal Rule 26(a) provides in part that, "The competency and privileges of witnesses shall be governed by Civil Rule 43 and by these rules, or in the absence of rule, by common law principles." Civil Rule 43(b), in turn, states that, "The competency and privileges of witnesses shall be governed by these rules, or in the absence of rule, by common law principles."[9] Civil Rule 43(g) (5) reads: "Every witness before testifying shall be required to express his purpose to testify by oath."

In earliest time, the oath "used to be regarded as a summoning of Devine vengeance upon false swearing, whereby when the spectators see the witness standing un-

---

6. Gilbert, in part, testified that appellant told him that "he had to do both of them rather than the one he originally intended, and that both of them were down in the ground and they wouldn't come up."

7. Appellant premised this argument on the presumption that George Toloff was, as a matter of law, an accomplice in the slaying of O'Day and Secco.

8. At the conclusion of the trial, appellant submitted a proposed instruction which, in referring to witness Gilbert's statement that he did not believe in God, reads in part "the credibility of his testimony is to be given the same weight as if no oath or affirmation of any type was administered." The trial court refused to give this requested instruction. This refusal, together with the court's rulings upon appellant's various motions concerning Gilbert's testimony, are asserted as reversible error in this appeal.

9. Civ.R. 43(d) also states that, "Whenever under these rules an oath is required to be taken, a solemn affirmation may be accepted in lieu thereof."

harmed, they know that the Devine Judgment has pronounced him to be a truth-teller."[10] This was followed by the more contemporary, "subjective" theory of the oath. As one court put it:

> The purpose of the oath is not to call the attention of God to the witness, but to call the attention of the witness to God; not to call upon Him to punish the false-swearer, but for the witness to remember that He will surely do so. By the laying hold of the conscience of the witness and appealing to his sense of accountability, the law best insures the utterance of truth.[11]

Today the theological underpinnings of the oath requirement have largely been removed, both through statutory provisions for affirmation, and by holdings to the effect that religious belief is not an essential prerequisite of the witness' competency.[12]

On the facts of this record we hold that the witness Gilbert was not rendered incompetent because of his statement that he did not believe in God. We further hold that the superior court did not commit reversible error in denying appellant's motions to strike, for a mistrial, and for judgment of acquittal.[13] All we have here is the witness' stark response on cross-examination that he did not believe in God.[14] There was no showing made that the witness was unaware of his serious obligation to relate the truth.[15] In such circumstances we believe that the trial court correctly ruled; the presumption subsists that the witness was properly sworn.[16] Regardless of the witness' lack of religious conviction, the

---

10. VI J. Wigmore, Evidence § 1816, at 285 (3d ed.1940). Dean Wigmore traces the evolution of the law of the oath up to present times at §§ 1815–32 of his treatise.

11. Clinton v. State, 33 Ohio St. 27, 33 (1877).

12. People v. Delaney, 52 Cal.App. 765, 199 P. 896 (1921), People v. Marsh, 403 Ill. 81, 85 N.E.2d 715 (1949). In State v. Beal, 199 N.C. 278, 154 S.E. 604 (1930), the witness stated that she did not believe in the existence of a Supreme Being but that any oath she took would bind her. The court admitted the testimony.
   Professor Morgan writes:
   The deliberate expression by a witness of his purpose to tell the truth by a method which is binding on his conscience probably still operates as some stimulus to tell the truth; but fear of punishment by supernatural forces for violation of an oath is generally regarded as virtually nonexistent; and the threat of prosecution for perjury has little effect.
   E. Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 186 (1948).

13. Embodied in this holding is our further conclusion that the trial court did not err in refusing appellant's requested instruction as to Gilbert's credibility. Supra n. 8.

14. As indicated, the statement in question was elicited on cross-examination after Gilbert had already testified on direct and long after the clerk had administered the oath. According to Dean Wigmore, under such circumstances, the objection should be deemed waived for lack of timeliness:

> [N]or should the opponent, *after a witness has taken the oath,* be allowed to inquire *as to its binding effect* upon him. (emphasis supplied in part)

VI J. Wigmore, Evidence § 1819, at 297–98 (3d ed. 1940).

15. Almost immediately preceding his disclosure that he did not believe in God, the witness, when asked on cross-examination if he could repeat the oath he took, stated: "I swore to tell the whole truth and nothing but the truth."

In the following cases the witnesses were permitted to testify when it was demonstrated that they possessed an awareness of the necessity for telling the truth: Gillars v. United States, 87 U.S.App.D.C. 16, 182 F.2d 962 (1950); People v. Lamb, 121 Cal.App.2d 838, 264 P.2d 126, 130–131 (1953); Ruocco v. Logiocco, 104 Conn. 585, 134 A. 73, 74–75 (1926); People v. Mueller, 2 Ill.2d 311, 118 N.E.2d 1, 3 (1954); Pastore v. Sasso, 317 Ill.App. 538, 46 N.E.2d 857 (1943).

16. In Curtis v. A. Lehmann & Co., 115 La. 40, 38 So. 887, 889 (1905), the witness was a non-believer, but was administered a conventional oath similar to that taken by Gilbert in the instant case. The Lou-

form in which the oath was administered is presumed to have been binding on the witness' conscience in the sense of impressing upon him the seriousness of the obligation to tell the truth.

Appellant's final two specifications of error relate to the testimony of George Matthew Toloff, a witness for the prosecution. Appellant's first contention is that reversible error was committed by the trial court when it refused appellant's request that the jury be instructed, as a matter of law, that the witness Toloff was an accomplice. It is a curious fact that, in the trial of this matter in the superior court, and in the parties' briefs here, this court's own precedents pertaining to the law of accomplices have been entirely ignored or overlooked.[17]

In Mahle v. State[18] we said:

An accomplice is generally defined as one who in some manner, knowingly and with criminal intent aids, abets, assists or participates in a criminal act.

In *Mahle*, appellant argued that it was error for the trial court not to have instructed the jury that Ahern was an accomplice. There the undisputed testimony showed that Ahern had assisted in breaking open a safe which the defendant and others had removed from the premises of a Sears Roebuck store in Anchorage. On these facts it was held that:

The larceny charged in the indictment is not only as to the safe but also as to its contents of currency and checks. With full knowledge that the safe * * * had been stolen, Ahern entered into the final asportation and disposition of this property. He voluntarily participated in the completion of the crime by assisting in forcing open the safe, extracting the contents therefrom and then disposing of the safe and its contents. He thus made himself an accomplice in the larceny.[19]

In Daniels v. State,[20] this court was again called upon to discuss the law of complicity. There evidence was adduced to the effect that co-defendants Daniels and Ellison visited the home of David and Sharon Swanagan and informed David, without going into detail, "that they knew of a place where they used to pick up Christmas money and * * * they asked him if he cared to look at it." David then left with the two men and participated in a burglary. Although the three men drove Sharon's car, there was no evidence that she consented to such use, or even had knowledge thereof. When the trio returned with the bag of money they had stolen, Sharon was asleep. They awakened her and "dumped" some money from several small bank money bags onto

---

isiana Supreme Court held the following:

The Code does not provide for the special case of a witness who has no religious scruples against taking an oath, but does not consider an oath taken 'on the Bible' as binding on his conscience. In such cases the common law permitted the oath to be so administered as to suit the conscience of the witness, not regarding the mode of swearing as the material part of the oath.

\*  \*  \*  \*  \*

The question is one of mode or form, and not of substance, and the legal presumption is that the witnesses were properly sworn * * *.

Accord, VI J. Wigmore, Evidence § 1818 (3d ed.1940).

17. Early in the history of this court, the first decision on the law of complicity was rendered in Oxenberg v. State, 362 P.2d 893, 897 (Alaska 1961). This was followed by Mahle v. State, 371 P.2d 21, 25 (Alaska 1962); Braham v. State, 376 P.2d 714 (Alaska 1962); Daniels v. State, 383 P.2d 323, 324–325 (Alaska 1963) and Taylor v. State, 391 P.2d 950 (Alaska 1964); Fajeriak v. State, 439 P. 2d 783 (Alaska 1968) (decided subsequently to this appeal).

18. 371 P.2d 21, 25 (Alaska 1962) (footnote omitted).

19. 371 P.2d 21, 25 (Alaska 1962) (footnote omitted).

20. 383 P.2d 323, 324–325 (Alaska 1963).

her bed. She assisted David and one of the defendants in counting out the money and "got to keep the pennies for herself."

In *Daniels,* we sustained the trial court's ruling that Sharon Swanagan was not, as a matter of law, an accomplice. In reaching this conclusion we distinguished Ahern's involvement in the *Mahle* [21] case. In so doing, we said that Sharon did not in any way aid or participate in the criminal acts of the three men.

> She did not know what 'jobs' the three men were going to 'pull' when they left the house. Not until she saw them 'dump' the money out of the bags did they tell her or did she surmise that they had burglarized and stolen from a schoolhouse.[22]

We further stated in *Daniels* that even if it be assumed that Sharon did know of the criminal plans of the three men:

> [T]hat fact alone would not have made her an accomplice under the law. Neither the knowledge that a crime is being committed, nor the concealment of that knowledge makes a person an accomplice, unless he aided or participated in the offense or conspired to commit it.[23]

■ In our view, on the facts appearing in this record, the question of whether Toloff was an accomplice lies in an area between the factual situations which were present in the *Mahle* and *Daniels* cases. In short, we hold that it was not error for the trial court to have left the resolution of this question for the jury's determination.[24]

In regard to the issue of Toloff's complicity, the evidence established the following: Late in May 1966, Toloff came upon Flores, Secco, and O'Day sitting in a parked car in Anchorage. Toloff joined the three and shared with Secco and O'Day the contents of a wine bottle he had just purchased. Appellant drove them all to Wasilla, and during the trip Toloff heard reference made to the fact that Secco and O'Day had to leave town because of some stolen items which had been found in their apartment. After reaching the Wasilla area, appellant drove the three men to a remote Quonset hut.

Arriving at this Quonset hut, appellant, Secco, and Toloff went inside the structure. Appellant then asked Secco to stay. Toloff started to leave, and while doing so heard Secco and appellant arguing. Toloff then testified:

> I turned around and * * * Secco was on the floor and Flores had his foot on his throat.
>
> * * * * * *
>
> * * * I turned around and went back and uh Flores said he was dead, and he took his clothes off him and took him—drug him out the back side and asked me to help him take him down to this swamp, which I did * * *.

Toloff then helped appellant bury Secco and, pursuant to appellant's instructions, built a fire for the purpose of destroying Secco's clothing. In response to counsel's interrogation as to why he had assisted appellant in Secco's burial, Toloff testified that he was "scared" and did not want to

---

21. 371 P.2d 21 (Alaska 1962).

22. 383 P.2d 323, 324–325 (Alaska 1964).

23. Id. at 325 (footnote omitted). As for the fact that Sharon retained some of the proceeds of the burglary for herself, the court said:
   > But that is a separate offense and would not make her an accomplice of the thieves, unless * * * she conspired in a pre-arranged plan with David and the defendants for them to steal the money and to deliver it * * * to her.

Id. (footnotes omitted). See also Taylor v. State, 391 P.2d 950, 951 (Alaska 1964).

24. In the court's instructions pertaining to accomplices, the jury was in part charged that:
   > It is the function of the jury in this case, to first determine from the evidence whether or not any one or more of the witnesses were accomplices to the crime or crimes charged in the Indictment.

become involved because he was on probation.

Appellant then drove Toloff and O'Day back to Anchorage.[25] Toloff and O'Day resumed drinking, looked at some canoes with appellant, and then drove along the highway leading towards Palmer from Anchorage.[26] In the Palmer area, appellant stopped the car so the three could relieve themselves. At this point Toloff testified that:

Flores * * * hit O'Day with a tire iron. * * * O'Day went down on the ground, and he [appellant] started hittin' him with a big rock * * * he was hittin' him in the head * * * there was blood all over the place * * * [O'Day] was just moaning.

Well, he hit him with the rock and then he took his clothes off and started pullin' him towards the bank. He told me to help him, so I helped him take him down the bank.

After moving O'Day a few hunderd feet, appellant told Toloff to go back to the car and get a shovel out of the trunk. At this time appellant gave Toloff the trunk key. After Toloff came back with the shovel, appellant hit O'Day with it several times and then buried him. Toloff testified that he helped appellant bury O'Day because he was "scared of him [appellant] and scared of being involved in it so that it'd violate my probation." Toloff also testified that he did not know what was going to happen to O'Day. When Toloff and appellant returned to Anchorage, appellant said to Toloff "not to talk about it and,

if the police came around, don't get scared and tell them anything."

On the basis of the foregoing, we have concluded that the question whether Toloff in some manner, knowingly and with criminal intent, aided, abetted, assisted, or participated in the slaying of Secco or O'Day was properly submitted to the jury. Unlike the *Mahle* and *Daniels* cases, it was not error on the trial court's part to have refused to determine as a matter of law the issue of Toloff's status as an accomplice.

■ Appellant's final point in this appeal is that the superior court committed error when it failed to instruct the jury that the testimony of an accomplice should be viewed with distrust. Criminal Rule 30(b) (2) provides that the trial court shall, on all proper occasions, instruct the jury that "the testimony of an accomplice ought to be viewed with distrust." Appellant's argument here is that the trial court committed reversible error because it instructed the jury that "the testimony of an accomplice should be viewed with caution and weighed with great care." Under the circumstances of this record, we are of the opinion that the trial court's failure to use the word "distrust" in its instructions pertaining to the testimony of accomplices did not constitute reversible error.

First, we note that at no time did counsel for appellant object to the court's use of "caution" instead of "distrust" in its accomplice instruction.[27] Further, in his proposed instructions on the subject of

---

**25.** Appellant told O'Day, who had been asleep in the car while the killing and burial were carried out in the area of the Quonset hut, that Secco had hitched a ride to some place he knew "up on down the highway there."

On the way back to Anchorage from the Quonset hut, in the Big Lake area, appellant spotted a state trooper's vehicle and before meeting it had Toloff throw a .38 snub-nose revolver out of the car. Appellant was given a citation for operating a motor vehicle without its registration.

**26.** Before driving towards Palmer, Toloff testified that he told appellant "if he had any ideas, that I'd left a letter with my dad. He told me to go get O'Day and go look at them canoes."

**27.** In Kugzruk v. State, 436 P.2d 962, 963–964 (Alaska 1968), we reiterated our prior rulings to the effect that we will not consider on appeal any objection which was not raised at the trial level. We also alluded to Crim.R. 47(b) which provides that: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to

accomplice testimony, appellant did not request that the word "distrust" be employed. Specifically, as to witnesses Gilbert and Toloff, appellant in part requested that the court charge that their testimony should be viewed with extreme caution because of their participation in the circumstances of this offense as accomplices or accessories after the fact.[28]

Additionally, we consider it of importance that the court in its accomplice instructions did inform the jury that it was their function, in regard to corroborating evidence, to decide "what weight you will give it in determining if such evidence is effective in making the testimony of an accomplice worthy of belief."

In light of these factors, and in view of the extensive corroborating evidence which was produced concerning Toloff's testimony, we are of the opinion that the court's failure to instruct that the testimony of an accomplice ought to be viewed with distrust does not require a new trial.[29]

The judgment and commitment entered below is affirmed.

the attention of the court." We do not consider the court's failure to follow Crim.R. 30(b) (2) in this case plain error.

28. In People v. Hamilton, 33 Cal.2d 45, 198 P.2d 873, 877 (1948), the California Supreme Court held that the use of "caution" was not sufficient compliance where the applicable statute required that the jury be instructed to regard an accomplice's testimony with "distrust." The court further held that where the state's case rested principally on the testimony of the accomplice, an error in the cautionary instruction would warrant reversal.

29. Assuming that the jury found Toloff was an accomplice, we note that the court's instruction concerning corroboration was contrary to our holding in Oxenberg v. State, 362 P.2d 893, 896–897 (Alaska 1961). In the case at bar the jurors were in essence told that they were to resolve issues of corroboration by viewing the corroborating evidence separate and apart from the accomplice's testimony. In *Oxenberg*, we held that such an instruction was not a correct interpretation of the law and that "under our interpretation, the trial court's instruction was more favorable to Oxenberg than was necessary. Hence, he has nothing to complain about." Id. at 898. This holding is applicable to the case at bar.