Walter Mack GALAUSKA, Appellant,

v.

STATE of Alaska, Appellee.

No. 2027.

Supreme Court of Alaska.

Oct. 25, 1974.

Stephen C. Cowper, of Cowper & Madson, Fairbanks, for appellant.

Norman C. Gorsuch, Atty. Gen., Daniel W. Hickey, Dist. Atty., Juneau, Robert B. Downes, Asst. Dist. Atty., Fairbanks, for appellee.

Before RABINOWITZ, C. J., ERWIN, BOOCHEVER and FITZGERALD, JJ., and MOODY, Judge.

## OPINION

FITZGERALD, Justice.

Shortly after midnight on January 29, 1973, Arthur Charlie, Walter Galauska and Roger Peter left Fairbanks in Galauska's pickup truck driving the Steese Highway toward Chatanika. After passing Milepost 27, the vehicle was stopped on the roadway and all three men got out. Immediately thereafter Arthur Charlie was struck on the head with a rifle and knocked to the ground. He was dragged to a small ravine close by the highway and pushed over the edge, rolling to the bottom.

John Balas, who lived at Mile 27½ on the Steese, was awakened early that morning by the barking of his dogs. He went outside to investigate. Hearing what he believed was someone groaning, he drove to the location of a telephone and called the state troopers at Fairbanks. Troopers Schouten and Port were dispatched. Balas

was instructed to meet the two troopers at Mile 13¾. After rendezvousing, they drove to the point where Balas had heard the groans. There they found Charlie lying face down at the bottom of the ravine. Trooper Port immediately examined Charlie for vital signs of life and was able to find a weak pulse. Charlie was carried to the patrol car and transported to the hospital at Fairbanks. There he was pronounced dead shortly after arrival. Later an autopsy disclosed that Charlie's injuries included a fractured skull.

In the course of their preliminary investigations, the state troopers interviewed both Galauska and Peter. Based on these interviews and evidence presented to the grand jury, Roger Peter and Walter Galauska were jointly indicted for the murder of Arthur Charlie. Peter pled guilty shortly before trial to an information which charged him with manslaughter. This crime was said to have occurred when Peter rolled the wounded and helpless Charlie into a ravine near the highway and then abandoned him. Later at Galauska's trial on the murder charge, both Peter and Galauska testified and each accused the other of beating Charlie with the rifle.

Since the testimony at trial sharply conflicted on the details of the killing, we have carefully examined the circumstances leading up to the event.

Walter Galauska had been well acquainted with Arthur Charlie for at least six or seven years before the assault. Roger Peter was likewise well acquainted with Charlie, and it was said that Charlie was his cousin. Galauska and Peter became acquainted during December of 1972, when both were patients at the Fairbanks detoxification center.

Shortly after 8 p. m. on January 29, 1973, Galauska, in company with Peter, drove his wife to downtown Fairbanks so that she might play bingo. Galauska left his truck in a parking lot and he and Peter began an extended tour of the Fairbanks bars, drinking as they went.[1] While thus engaged, they met Robert Olsen, Tom Flaherty and Arthur Charlie.

According to Galauska he had hoped to see the three men because Mrs. Galauska was to testify against them in court on the following day in connection with a burglary. Charlie, Flaherty and Olsen, together with Galauska had been jointly charged with the crime but Galauska had been successful in having the case against him dismissed. Mrs. Galauska had been concerned about testifying against the defendants, so Galauska had agreed to explain the circumstances to them hoping this would avoid hard feelings. When Olsen, Flaherty and Charlie were told of his wife's concern about testifying in the burglary case, Galauska recalls that they did not appear to be worried at the prospect of Mrs. Galauska's testimony. Rather they explained that they had been advised by their attorney there was little to worry about since Arthur Charlie had stated that he was not going to say anything about anybody, and was going to stand on the fifth amendment.

Roger Peter testified at Galauska's trial about this conversation. He recalled it quite differently. According to Peter, Galauska told Olsen, Flaherty and Charlie that he had been in the detoxification center and now had a "straight mind" to think about the case. Galauska further stated that "the state is gonna take Charlie and convict all three of them, regardless of him being charged or not, and give all three of them 10 years on larceny in the building." When questioned about his understanding of "all three of them", Peter testified that Galauska was referring to Olsen, Flaherty and Galauska. This testimony of Peter, if believed, has to do with a possible motive on the part of Galauska. It implies that Galauska continued to fear prosecution on the burglary charge if Charlie were to testify. Peter also testified that Galauska suggested a course of action for silencing

---

[1]. Galauska had been discharged from a detoxification center about 6:00 P.M. on the same day.

Charlie: the best thing to do "is that Arthur Charlie make a disappearing scene for 120 days." Peter agreed with Galauska's account that at this point in the conversation Charlie said he was "gonna swear on the fifth amendment and that he wasn't gonna testify at all."

Following this conversation, several more drinks, and an unsuccessful attempt by Galauska and Peter to locate Galauska's wife, the two returned to a bar where they again met Arthur Charlie. Galauska offered to buy a half gallon of wine and suggested the three take a ride in the pickup to drink it. His suggestion met with favor; the wine was bought and together they returned to the pickup. Peter started to drive, but after a few blocks Galauska demanded to take the wheel. Galauska's testimony was that he drove to the Steese Highway intending to proceed directly toward Chatanika. Peter testified that he thought they were going to Galauska's house, but instead Galauska suddenly announced, "No, I'm taking Charlie out to hide for 120 days," and then drove toward Chatanika.

From this point on the testimony of Peter and Galauska becomes even more divergent. At trial Galauska gave the following explanation of the killing. On the way to Chatanika an argument broke out between Peter and Charlie which resulted in blows between them. He was compelled to stop the truck while the two combatants continued their fight. Galauska stepped down on the driver's side of the vehicle to take a drink from the wine bottle. He heard swearing and scuffling, then saw Roger Peter reach into the truck, pull the seat forward and remove a rifle. At this point Galauska testified he ran around the front of the truck with the intention of disarming Peter. He saw Peter standing over Charlie, hitting him with the rifle. Galauska went on to testify that he was able to pull the rifle away from Peter and to kneel down beside Charlie. He told Charlie, "Come on and get up," intending to help him into the truck and back to town. Instead, according to Galauska, Charlie said, "Get that crazy Roger Peter away from me. I'll hitchhike a ride to town." At this Galauska responded, "If that's the way you want it," and started to climb into the truck. But Peter now seized the rifle and again struck Charlie. Finally Peter ordered Galauska to get into the pickup. Then Peter laid the rifle on the floorboards and directed Galauska to drive off. According to Galauska, Charlie was left where he lay alongside the road. He was not rolled into the ravine.

Peter's testimony of the events differs substantially. He testified that the pickup was stopped by Galauska to permit the men to urinate. When Charlie got out he accidentally slipped hitting Peter's previously injured eye. Peter, believing himself attacked by Charlie, immediately retaliated. However, Charlie explained his initial blow had been struck accidentally and so Peter turned away to the end of the truck and urinated. While thus engaged, he continued to talk to Charlie, who remained behind Peter some six or seven feet away. Peter heard a thud and as he turned saw Galauska with a rifle in his hands. He saw Charlie and Galauska struggling for the weapon. Peter himself grabbed at the rifle but was knocked off balance. After he was able to get up, he tried to remove the clip from the rifle which was still held by Galauska. When Peter was able to pull the clip out of the magazine, he began to unload it. Galauska had by then managed to knock Charlie down and was beating him on the head with the rifle. Peter disarmed Galauska and threw the rifle in the truck. He told Galauska, "We got to get him back to town." Galauska refused, saying, "No, he's not going back in my truck. He'll be all right in a couple of hours; help me roll him down the hill." Peter testified he helped Galauska roll Charlie into the ravine. He noted that Charlie was still breathing. On the return trip to Fairbanks Peter drove. He was told by Galauska to keep his mouth shut and that

things were going to be all right; but, they would have to get rid of the rifle. Peter drove off the highway into a drive where the rifle was thrown from the truck.

The troopers' investigation revealed that the bottom of the ravine where Charlie had been located was approximately fifty feet from the roadway. Along the roadway they found blood spots, a urine spot, the butt plate of a rifle, a beer can and a rifle cartridge. A number of days later the rifle was discovered in the snow near the driveway where it had been thrown. It was identified as belonging to Galauska and the cartridge recovered from the scene of the crime by the state troopers was shown to be the same caliber as Galauska's rifle.

At the trial, the jury resolved the contradictory evidence and returned their verdict, finding Galauska guilty of manslaughter. In this appeal Galauska attacks the indictment as invalid. He claims the evidence at trial was insufficient to convict; he objects to an evidentiary ruling of the trial court and finally to the instructions given the jury.

## I.

## THE INDICTMENT

■ Galauska urges that his indictment was fatally flawed by the presentation of inadmissible hearsay evidence to the grand jury. Galauska moved, unsuccessfully, to quash the indictment prior to trial; so the error, if any, is properly before this court.[2]

Galauska bases his claim of error on testimony presented to the grand jury by a police officer who testified to a statement by Peter. This statement was similar in import to the testimony which Peter later gave at the trial of Galauska, i. e., that Galauska had beaten Arthur Charlie with a rifle, over Peter's protests, and that Galauska and Peter rolled Charlie off the roadside into a ravine.

■ This statement as presented by the police officer was hearsay evidence. At the time of the grand jury proceedings, the State was seeking a joint indictment against Peter and Galauska. Thus the statement by the police officer before the grand jury was admissible hearsay evidence against Peter, but inadmissible as against Galauska.[3]

---

2. In Taggard v. State, 500 P.2d 238, 243 n. 20 (Alaska 1972) we noted that challenges to an indictment based on defects not appearing on the face of the indictment must be raised prior to trial. Since Galauska's objection involved the sufficiency of the evidence supporting the indictment, the objection was timely raised before trial thereby preserving the issue on appeal.

3. The underlying reasons for limiting the scope of admissions with respect to codefendants have been clearly articulated by Wigmore: "The probative process consists in contrasting the statements of the same person made now as litigant and made formerly elsewhere, and it is in that view that it becomes necessary to define the identity of the person. It follows that the statements of one who is confessedly a distinct person B do not become receivable as admissions against A merely because B is also a party. In other words, the *admissions of one complaintiff or codefendant are not receivable against another*, merely by virtue of his position as a coparty in the litigation.

This is necessarily involved in the notion of an admission; for it is impossible to discredit A's claims as a party by contrasting them with what some other party B has elsewhere claimed; there is no discrediting in such a process of contrast, because it is not the same person's statements that are contrasted. Moreover, ordinary fairness would forbid such a license; for it would in practice permit a litigant to discredit an opponent's claim merely by joining any person as the opponent's coparty and then employing that person's statements as admissions. It is plain, therefore, both on principle and in policy, that the statements of a coparty (while usable of course against himself) are not usable as admissions against a coparty.

 · · · · ·

The principle is particularly illustrated by the rule in regard to the admissions of a *codefendant in a criminal case*; here it has always been conceded that the admission of one is receivable against himself only."

4 J. Wigmore, Evidence § 1076, at 155–57 (J. Chadbourn rev. ed. 1972) (footnotes omitted). See, e. g., People v. Leary, 172 P.2d 34, 37–38 (Cal.1946) ("Accusatory statements, when they are admissible, may be re-

Alaska R.Crim.P. 6(r) involves the presentment of evidence before grand juries:

"Evidence which would be legally admissible at trial shall be admissible before the grand jury. In appropriate cases, however, witnesses may be presented to summarize admissible evidence if the admissible evidence will be available at trial. *Hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction.* If hearsay evidence is presented to the grand jury, the reason for its use shall be stated on the record." (emphasis added)

██ The first sentence of the rule deals with the presentment of admissible evidence and encompasses hearsay evidence which would be admissible pursuant to one of the recognized exceptions to the hearsay rule.[4] In those instances there is no need for a compelling justification and the reason for its use need not be stated on the record. However, in circumstances involving inadmissible hearsay evidence there must be a compelling justification for its introduction to the grand jury.

In Taggard v. State, 500 P.2d 238 (Alaska 1972), a police officer testified before a grand jury about information related by an informant incriminating the defendant. We held that a grand jury must be given some means of evaluating the worth of the hearsay evidence.[5] In order to assess the sufficiency of hearsay evidence supporting the indictment, this court adopted a two step analysis:

"The threshold question, which must be determined in all cases involving a challenge to the sufficiency of the evidence supporting a grand jury indictment, is whether the evidence presented a sufficiently detailed account of criminal activity and the defendant's participation in this activity so that 'if unexplained or uncontradicted it would warrant a conviction of the person charged with an offense by the judge or jury trying the offense.' Where hearsay evidence has been introduced, we must also determine whether the credibility of the informant has been sufficiently established so that the grand jury may know how much weight to give to the hearsay testimony." [6]

Following our decision in *Taggard,* Alaska R.Crim.P. 6(r) was amended and the state was required to show compelling reasons before resorting to inadmissible hearsay testimony at the grand jury.

In State v. Skan, 511 P.2d 1296 (Alaska 1973) we found the evidence presented to a grand jury insufficient to sustain an indictment. The testimony consisted of a hearsay statement given by an accomplice read to the grand jury by a state trooper. There was nothing before the grand jury other than the statement itself upon which the jury could evaluate the reliability of the testimony. The statement contained internal inconsistencies, making the evidence of questionable value. We noted too

ceived against a defendant whether he be tried alone or jointly, provided that in the latter case they are properly limited to the defendant concerned."). *See also* C. McCormick, Law of Evidence § 239, at 505 & n. 20 (1954).

4. Had the person who witnessed the criminal act related his observations of the incident, there would be no hearsay problem. Similarly, if Galauska, as a declarant made an incriminating admission, the witness who heard the declaration would be allowed to present the evidence under the admission's exception to the hearsay rule. In the instant case, however, a police officer merely related what the witness (Peter) had stated about the

actions and admissions of the declarant (Galauska). Since the police officer as a third party did not observe any conduct or hear any declarations, a traditional hearsay problem was presented.

5. For an incisive commentary providing a heuristic device for analyzing the testimonial infirmities underlying the basis for the hearsay rule, see Tribe, Comment—Triangulating Hearsay, 87 Harv.L.Rev. 957 (1974).

6. 500 P.2d at 242–243 (footnote omitted). *See also* State v. Johnson, 525 P.2d 532 (Alaska 1974); State v. Skan, 511 P.2d 1296, 1297 (Alaska 1973).

that Alaska R.Crim.P. 6(r) was not complied with since no explanation was given why the witness was not called before the grand jury.

■ Galauska alleges the State failed to present compelling reasons for introducing Peter's inadmissible hearsay evidence. When the indictment for murder was sought against Galauska and Peter, the state's attorney stated for the record made at the grand jury proceedings that he intended to present Peter's written statement. He chose not to bring Peter before the grand jury since that could prejudice his constitutional rights. However, he advised the grand jury in the event it wished that Peter be presented, he would request the public defender to allow Peter to make a statement to the grand jury. The state attorney correctly advised the grand jury that while Peter's statement amounted to hearsay evidence it would be admissible against him. Against Galauska the statement was hearsay but there was a possibility that Peter might ultimately testify in the case. The state's attorney advised the grand jury that the statement would be corroborated by other testimony.

Even though Peter's hearsay statement was admissible before the grand jury against him, Criminal Rule 6(r) was complied with in this case. Calling Peter before the grand jury would have led to the introduction of direct evidence only if Peter incriminated himself.[7] Concern for Peter's substantive rights consituted a compelling reason under Criminal Rule 6(r) for the use of his hearsay statement at the grand jury.[8]

■ As we have noted, the evidence before the grand jury when taken together presented a detailed account of the crime so as to warrant a conviction if the evidence is unexplained or uncontradicted at trial. Peter's statement itself outlined a detailed account of the criminal activity and the participation of both Galauska and Peter. The statement related specific details concerning the manner of the assault and the subsequent abandonment of the injured victim in a ravine.

In addition to Peter's statement the state produced considerable corroborative testimony at the Grand Jury. Testimony was given that Galauska, Peter and Charlie were seen driving toward the highway in Galauska's truck shortly before the assault, and that the truck was found the next morning in Galauska's driveway. Police officers testified to the presence of bloodstains in the truck. The officers further testified to Galauska's admission of having seen Charlies in a bar on the evening of the killing, and related Galauska's claim of loaning his truck to a third party on that evening. The third party testified to the falsity of Galauska's claim. In addition, according to police testimony, it would probably have required two men to carry the inert Peter to the edge of the ravine.[9] As we see it, this evidence was sufficiently corroborative of Peter's story to enable the grand jury to properly weigh the worth of Peter's hearsay statement and was sufficient.

Since the presentment of the hearsay evidence complied with the *Taggard* standards and Alaska R.Crim.P. 6(r), we can find no substantial defect in the evidence

---

7. Alaska Const., Art. I, § 9.

8. The American Bar Association Project on Standards For Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function § 3.6, at 89–90 (Approved Draft, 1971) stated that the prosecutor should give "due regard for the privilege against self-incrimination and the right to counsel requires that the prosecutor advise such a person, before seeking to require his testimony before a grand jury, that he may be implicated and that he should seek independent

legal advice." Moreover, the state should not seek to "compel the appearance of a witness whose activities are the subject of the inquiry if the witness states in advance that if called he will exercise his constitutional privilege not to testify." *Id.* at 88.

9. Furthermore, the police had found the .303 cartridge at the scene of the killing at the time of the grand jury proceeding, but had not yet found the .303 rifle which was later proved to be owned by Galauska.

presented to the grand jury nor in the indictment which followed to warrant reversal of the conviction.

## II.

## SUFFICIENCY OF THE EVIDENCE AS TO THE CAUSE OF DEATH

Galauska's next argument on appeal concerns the State's failure to introduce sufficient evidence to establish beyond a reasonable doubt that the beating caused Charlie's death. Accordingly, Galauska claims error by the trial court in denying his motions for acquittal at the close of the State's case and at the end of the trial.

The argument is based on a restricted reading of Armstrong v. State, 502 P.2d 440 (Alaska 1972). In *Armstrong* we discussed the standards to be utilized in determining whether expert testimony was necessary to support a conviction:

"Expert testimony is not necessarily essential to support a conviction of homicide. Thus, where it is apparent that ordinary laymen could perceive, from such factors as the nature of the wound or the circumstances surrounding an attack, that a defendant's acts caused the death, medical testimony as to cause of death is not essential. A contrary result is reached, however, where from the nature of the agency alleged to have caused the death, the causal connection is not within the average layman's perception. In such circumstances, expert testimony is essential to support a conviction.

. . . [I]n the absence of such testimony, any deliberation by the jury as to cause of death would have been baseless conjecture."[10]

From this quoted passage Galauska extrapolates a rule requiring medical experts

to state with certainty the exact cause of death in cases where expert testimony is necessary to prove the cause of death. Such a rule would be unworkable in homicide cases where the limitations of medical science may not permit such certainty. For this reason we held in *Armstrong* that the jury's function is to decide on the cause of death, aided where necessary, by medical experts:

"In this case expert testimony served to reveal the physiological relationships relevant to [the victim's] death; once these were explained, the jury was competent to make an independent determination of cause of death on the basis of all the relevant evidence before it."[11]

In the present case, the jury was competent to make an independent determination based on all the evidence as to the cause of death by putting into proper perspective the testimony presented by the medical experts. The details of the assault and abandonment of Charlie coupled with the medical testimony demonstrates sufficient evidence to sustain the conviction.

Even accepting Galauska's contention concerning the required certainity in expert testimony in establishing the cause of death in this case,[12] we find ample evidence from which the jury could have determined, with the required certainty, that Charlie's death resulted from the beating. Dr. Roger Harding performed an autopsy on the body and discovered, in addition to the injuries apparent to the eye, an epidural hematoma beneath Charlie's skull at the point of fracture. According to Dr. Harding, such a hematoma usually causes death fairly rapidly unless treatment is received. Dr. Harding could point to no other plausible reason as the cause of death. It was his best guess at the time of the autopsy that the fracture and hematoma had caused

10. 502 P.2d at 445–446. (footnotes omitted)

11. 502 P.2d at 446.

12. This contention is itself debatable; the evidence indicated that Charlie was severely beaten, suffering multiple bruises, cuts and a fractured skull. It isn't necessary for us

to decide whether these injuries, together with the fact of death a few hours after their infliction, were so obviously a cause of death as to be within the average layman's perception, in view of our holding on the adequacy of the expert medical testimony, *infra*.

death. Moreover, defense counsel did not cross-examine Dr. Harding as to the cause of death. On these facts we have no difficulty in holding that the jury could have found beyond a reasonable doubt that the beating inflicted on Charlie caused his death.

## III.

## THE EVIDENTIARY RULING

Galauska asserts error by the trial court in refusing to allow defense counsel to present evidence of particular assaults which Peter had made in the past. The defense attempted to introduce evidence of prior assaults to show that in all probability Peter, rather than Galauska, had assaulted Charlie.

■ As a general rule, evidence of character (in this case, predisposition to violence) is not admissible as tending to show that a person committed an act consistent with that character.[13] The risk of prejudice to a defendant in a criminal trial or, in general, distracting or confusing the jury, usually outweighs the debatable probative value of such evidence.[14]

■■ This is not to say that such evidence should always be excluded. Character evidence is allowed for a number of different reasons. Evidence of other crimes is admissible to show a motive, or a larger plan or conspiracy,[15] and in a limited number of situations, is admissible on other independent grounds, e. g., evidence of convictions for crimes involving dishonesty is admissible to show that a witness' testimony is untrustworthy.[16]

■ One accepted "exception" allowing evidence of prior crimes involves instances where the previous crime is so nearly identical in method with the crime in question that it indicates the same person committed both crimes.[17] Galauska urges that previous assaults committed by Peter fall under this "signature-crime" exception. We must agree with the trial court, however, that there was nothing particularly unique about either Peter's alleged prior assaults or the assault on Arthur Charlie.[18]

■ Galauska argues, alternatively, that character evidence was admissible here because its probative value was not vitiated by the countervailing factor of unfair prejudice. In this assertion he is correct—the prejudice cited as a reason for excluding evidence of prior crimes is prejudice to a criminal defendant's chances of a fair trial, not to any general interest in protecting witnesses from a besmirched reputation.[19]

---

13. *See* Nicholi v. State, 451 P.2d 351, 357 (Alaska 1969); Watson v. State, 387 P.2d 289, 293 (Alaska 1963).

14. "Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."
C. Wright & A. Miller, [Proposed] Rules of Evidence for United States Courts and Magistrates, Rule 404, at 36, Advisory Committee's Note (1973), *quoting* Tentative Recommendation and a Study Relating to the Uniform Rules of Evidence, Cal. Law Revision Comm'n, Rep., & Studies at 615 (1964).

15. C. McCormick, Law of Evidence § 157 (1954).

16. *Id.*, at 331; Alaska R.Crim.P. 26(f).

17. *See* Nicholi v. State, 451 P.2d 351, 357 (Alaska 1969).

18. Peter's prior alleged assaults involved beatings of members of his family, and a friend, none of which were shown to have been committed with a weapon other than his fists.

19. "Where the character offered is that of a *third person, not a party* to the cause, the reasons of policy . . . for exclusion seem to disappear or become inconsiderable; hence, if there is any relevancy in the fact of character, *i. e.*, if some act is involved upon the probability of which a moral trait can throw light, the character may well be received."
1 J. Wigmore, Evidence § 68, at 488 (3rd ed. 1940). *Contra*, C Wright & A. Miller, [proposed] Rules of Evidence for United States Courts and Magistrates, Rules 404, 405, (1973), which appear to make no provision for admitting character evidence under these circumstances.

■ The trial judge did, however, allow evidence of Peter's violent character. Defense counsel was permitted to ask the chief of police of Ft. Yukon (Peter's home town) about Peter's reputation for violence. Counsel also asked the chief for his personal opinion of Peter's character for violence, based upon the chief's personal observations. To both questions the chief of police answered that Peter was known to have a tendency toward violence, particularly when drinking.

■ The trial court did not allow defense counsel to introduce evidence of particular assaults. We conclude that the court did not abuse its discretion[20] in limiting character evidence to reputation and opinion. Under more compelling facts we believe it might have been advisable to allow limited testimony as to particular assaults.[21] In general courts allow only reputation evidence in order to avoid jury confusion and distraction.[22] In this case, the trial court did not err in his ruling that allowing the defendant to attempt to prove specific assaults would have consumed trial time and confused the real issues with evidence of arguable probative weight. We find no error in the trial court's rulings on this subject.

## IV.
## THE ACCOMPLICE INSTRUCTION

Galauska assigns as reversible error the trial court's refusal, upon request, to instruct the jury that an accomplice's testimony is to be viewed with distrust. Alaska R.Crim.P. 30(b) makes this instruction mandatory "on all proper occasions." The state responds that the instruction was improper because there was no evidence before the court from which it could be inferred that Peter or anyone else was legally an accomplice. We agree.

■ According to well-established legal authority, an accomplice is one who, with criminal intent, knowingly aids, abets, assists or participates in the crime for which the defendant is charged.[23]

■ Galauska's contention that Peter was an accomplice has two prongs. His first line of attack is that Peter was an accomplice, as a matter of law, thereby requiring the trial court to instruct the jury on the untrustworthy nature of an accomplice's testimony.[24] Galauska bases this argument on Peter's guilty plea to an information charging him with the manslaughter of Arthur Charlie. This guilty plea and conviction was, of course, an admission of record that Peter had committed the crime with which he was charged.[25]

20. The decision of a trial court concerning the admissibility of evidence are reviewable only for abuse of discretion. Lewis v. State, 469 P.2d 689, 695 (Alaska 1970).

21. Cf. 1 J. Wigmore, Evidence § 198, at 676–77 (3rd ed. 1940):

 When the turbulent character of the deceased, in a prosecution for homicide, is relevant . . . there is no substantial reason against evidencing the character by *particular instances of* violent or quarrelsome *conduct.* Such instances may be very significant; their number can be controlled by the trial Court's discretion; and the prohibitory considerations applicable to an accused's character . . . have here little or no force." (footnote omitted)

22. "Of the three methods of proving character provided by the rule, evidence of specific instances of conduct is the most convincing. At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time. Consequent-

ly the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry. When character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion." C. Wright & A. Miller, [Proposed] Rules of Evidence for United States Courts and Magistrates, Rule 405, comment at 37 (1973).

23. *See* Beavers v. State, 492 P.2d 88, 97 (Alaska 1971); Taylor v. State, 391 P.2d 950 (Alaska 1964).

24. Galauska was not requesting the trial court to forward to the jury the accomplice-as-a-matter-of-law instruction. This instruction was specifically disapproved in Anthony v. State, 521 P.2d 486 (Alaska 1974).

25. We do not now decide whether such a plea is *conclusive* evidence of commission of the crime in a proceeding to which Peter is not a party.

Although Galauska was charged with murder, the evidence supported the lesser-included offense of manslaughter. Thus, Galauska points out, both men were "charged" with manslaughter in the death of Arthur Charlie.

In contrast, the state argues that Peter and Galauska committed separate crimes. Peter pled guilty to an information charging him with "aiding and assisting one Walter Galauska roll the said Arthur Charlie into a snow-covered ravine and abandoning him . . . immediately after witnessing said Walter Galauska severely beat and strike the said Arthur Charlie about the read with a rifle . . . ." In the Galauska indictment, Galauska was charged with murdering Charlie by beating him about the head with a rifle. Therefore, the state contends, Peter and Galauska were not charged with the same criminal acts, and could not be accomplices. We agree with this analysis. The jury was instructed that Galauska was guilty of homicide, if at all, only if he had killed Charlie by beating him with a rifle. No instruction was given regarding Galauska's potential culpability for rolling the wounded Charlie over into the ravine, nor was there any evidence produced at Galauska's trial to show that the abandonment of Charlie was a cause of death.

■ In Taylor v. State, 391 P.2d 950 (Alaska 1964), it was held that in order to be an accomplice one must with the requisite intent take part in some way in the commission of a crime. Performing later acts which themselves amount to a crime does not make one an accomplice to prior crimes. Under the holding of *Taylor*, Peter was not an accomplice as a matter of law.[26] Thus the state is correct in its contention that Peter's earlier guilty plea by itself was not evidence that he was an accomplice in the crime for which Galauska was charged.

■ The second prong of Galauska's argument is that Peter's testimony at trial was sufficient to make him an accomplice. It is true that Peter admitted in his testimony that he was present at the scene of the crime and gave aid to Galauska after the beating of Charlie. However, in this jurisdiction one is not necessarily an accomplice merely because he is physically present at the scene of the crime and aided in its concealment. Fajeriak v. State, 439 P.2d 783 (Alaska 1968). The accomplice issue has been before this court a number of times. We have held that under some circumstances the trial judge is required to instruct on the issue as a matter of law.

In Mahle v. State, 371 P.2d 21 (Alaska 1962) the undisputed testimony revealed that Clyde Ahern participated in breaking open a safe which the defendant and others had removed from the premises of a Sears Roebuck store in Anchorage. We held that as a matter of law Ahern was an accomplice to the crime of larceny and it was error not to so instruct the jury. It was held in Daniels v. State, 383 P.2d 323 (Alaska 1968) that the witness was as a matter of law not an accomplice under circumstances where the witness helped to count the money after a burglary and larceny. This was so even though the witness might have foreknowledge that the crime was about to be committed.

■ In some circumstances the question of whether or not the witness is an accomplice may be properly left for the jury to decide. Such was the case in Flores v. State, 443 P.2d 73 (Alaska 1968). Flores had been charged with the murder of Jimmy O'Day and George Secco. The jury found him guilty of murder in the first degree as to Jimmy O'Day and of manslaughter in the death of George Secco. The circumstances of the killings were testified to at trial by George Toloff. The witness related that he was present at the remote quonset hut when an argument broke out between Flores and Secco. Toloff observed Secco with Flores' foot on his throat and shortly thereafter was told by Flores that Secco was dead. After the

26. Fajeriak v. State, 439 P.2d 783, 789 (Alaska 1968).

killing, Toloff aided Flores by dragging the body of Secco to a swamp.

Sometime later Flores was driving Toloff and Jimmy O'Day from Anchorage to Palmer. As they neared Palmer, Flores stopped the car so that the three could get out and relieve themselves. At this point Flores struck O'Day with a tire iron and with a rock. He then ordered Toloff to help him drag O'Day down a bank. After O'Day had been dragged for some distance, Flores directed Toloff to get a shovel from the trunk of the vehicle. Toloff complied and Flores then struck O'Day several times with the shovel. Toloff further assisted Flores in disposing of O'Day's body by burial. Under these facts it was held that the question of whether Toloff became an accomplice by having in some manner knowingly and with criminal intent aided, abetted, assisted or participated in the slaying of Secco and O'Day was properly submitted to the jury. However, the trial court in *Flores* failed to adequately instruct the jury that the testimony of an accomplice ought to be viewed with distrust.[27] The failure to give the proper instruction was held not plain error in view of the instructions actually given by the trial court, coupled with the failure of Flores' counsel to submit an appropriate instruction to the court. Moreover, the record revealed extensive corroboration concerning Toloff's testimony; hence a new trial was not required.

The facts in Fajeriak v. State were somewhat analogous to these of the case now before us. In that case, as here, the testimony was in clear conflict. Fajeriak was charged with the murder of Anthony Rizzo. He was found guilty on the eye witness testimony of Dean Gamradt and James Benton. In his defense Fajeriak claimed that Gamradt did the killing. On the other hand, Gamradt testified that Fajeriak fired the fatal shots killing Rizzo and that Gamradt and Benton participated

with Fajeriak in disposing of Rizzo's body. Under the testimony either Fajeriak had to be the murderer or Gamradt and Benton were the murderers. But Gamradt and Benton could not be accomplices as the record revealed no evidence that they either assisted Fajeriak in the shooting or were parties to a pre-arranged plan to do the killing.

 The evidence in the record now before us discloses that Galauska accused Peter of beating Charlie with the rifle while Peter on the other hand has testified that the fatal beating was administered by Galauska. Under the circumstances neither becomes the accomplice of the other. The trial court's refusal to give an accomplice instruction was not erroneous.

We find no reversible error and affirm the conviction.

BOOCHEVER, Justice (dissenting).

I dissent for the reason that I believe it was reversible error for the trial court to refuse the request of the defendant to instruct the jury that an accomplice's testimony is to be viewed with distrust.

Alaska R.Crim.P. 30(b)(2) specifies in part that the court, whether or not requested to do so, shall give the instruction on all proper occasions "[t]hat the testimony of an accomplice ought to be viewed with distrust . . . ."

This rule is not one recently engrafted upon the rights of a defendant, but finds its Alaskan origin in the Act of 1884, first providing for a civil government for Alaska and adopting the laws of Oregon then in force. The Oregon Code of 1862 provided for a mandatory instruction that the testimony of an accomplice ought to be viewed with distrust.[1] The statute codified a long-established common law practice.[2] Wigmore states:

The reasons which have led to this distrust of an accomplice's testimony are

---

27. Alaska R.Crim.P. 30(b)(2).

1. Annotated Laws of Oregon § 845 (Hill, 1887).

2. 7 J. Wigmore, The Anglo-American System of Evidence in Trials at Common Law § 2056, p. 319 (3rd ed. 1940).

not far to seek. He may expect to save himself from punishment by procuring the conviction of others. It is true that he is also charging himself, and in that respect he has burned his ships. But he can escape the consequences of this acknowledgment, if the prosecuting authorities choose to release him provided he helps them to secure the conviction of his partner in crime: . . . [3]

And in Fresneda v. State,[4] we stated that "[a]n accomplice's testimony is viewed with distrust, because the accomplice usually believes he has a personal interest in aiding the prosecution."

If ever there was a case where the policy behind the rule applies, this would appear to be one. Peter and Galauska told conflicting accounts of the homicide, each blaming the other for the clubbing. Each could be regarded as having a motive for committing the offense; Galauska to prevent Charlie from testifying, and Peter because of anger over Charlie having struck Peter's injured eye. They were jointly indicted for murder when Peter "made a deal" with the district attorney to plead guilty to manslaughter. He promised to testify if he would be given an eight-year sentence with five years suspended. Thus Peter had a desire to save himself from more severe punishment by procuring Galauska's conviction.[5] His was the only direct testimony as to Galauska's participation in the beating. Moreover, this is not a case where defense counsel failed to request the instruction as in Anthony v. State[6] where we were compelled to hold

that failure to give the instruction was nevertheless reversible error.

The majority engages in what appears to me to be a highly formalistic argument attempting to distinguish between the charge for which Galauska was convicted, beating Charlie about the head with a rifle, and the information to which Peter pleaded guilty, unlawfully killing Charlie by assisting Galauska in rolling him into a ravine and abandoning him. Both were convicted of manslaughter for killing Charlie.[7]

I agree with the majority's definition of an accomplice—one, who with criminal intent, knowingly aids, abets, assists or participates in the crime for which the defendant is charged.

When that definition is construed in light of the purpose behind Rule 30(b)(2),[8] I fail to see how the conclusion can be reached that there was no jury issue as to Peter's aiding, assisting or participating in the homicide for which Galauska was charged. Even assuming that he did not participate in the beating, he rolled Charlie, while still alive, into the ravine. He has pled guilty to the offense of manslaughter thus confessing an unlawful killing. Any question as to his intent was for the jury. According to Peter's version of the incident, he did not beat Charlie with the rifle. Galauska testified to the opposite effect. The jury was free to believe either's version of the offense, but they also could recognize the human trait of seeking to exculpate oneself and blame another. The jury could reasonably infer from the

3. *Id.* § 2057, p. 322.

4. 458 P.2d 134, 144 (Alaska 1969) (footnote omitted).

5. Peter was sentenced prior to the trial, but his sentencing was based on his agreement to testify. By this dissent, I am not suggesting that the district attorney's conduct was improper in any manner.

6. 521 P.2d 486 (Alaska 1974).

7. In Fajeriak v. State, 439 P.2d 783 (Alaska 1968), the defendant was convicted of first degree murder. Witnesses Benton and Gamradt aided in the disposition of the body of

Rizzo after Fajeriak had shot and killed him. The witnesses' participation was after the death of Rizzo so that the case may be distinguished from Galauska's although I do not imply that I agree with the refusal to give the instruction in *Fajeriak*. Galauska's case is closer akin to Mahle v. State, 371 P.2d 21 (Alaska 1962), wherein we held the instruction was mandated as to one who did not participate in stealing a safe, but later assisted in opening it.

8. The rationale for requiring an instruction to the jury pertaining to an accomplice's testimony is discussed in Anthony v. State, 521 P.2d at 491.

testimony that both participated in beating Charlie. The testimony was certainly subject to such an inference at the time that the case was submitted to the jury, which is the temporal frame within which the requested instruction must be considered. The jury should have been instructed, in the same manner that we suggested in *Anthony,* that *if* they found Peter to be an accomplice, his testimony should be distrusted. I would hold that it was reversible error not to give the requested instruction as required by our rule.